DALEHITE ET AL. *v.* UNITED STATES.

No. 308.   Argued April 6–8, 1953.—Decided June 8, 1953.

*John Lord O'Brian* and *Howard C. Westwood* argued the cause for Dalehite et al., petitioners. With them on the brief were *Thomas Fletcher, Neth L. Leachman, T. E. Mosheim, John R. Brown, M. S. McCorquodale, Vernon Elledge, Wm. Merrick Parker, W. Graham Claytor, Jr.* and *Stanley L. Temko.*

*Austin Y. Bryan, Jr.* argued the cause for the Pan-American Refining Corporation et al., petitioners. With him on the brief were *George D. Vail, Jr.* and *David Bland.*

*Morton Liftin* and *Oscar H. Davis* argued the cause for the United States. With them on the brief were *Acting Solicitor General Stern, Assistant Attorney General Burger, Judge Advocate General Brannon, Assistant Judge Advocate General Mickelwait, Paul A. Sweeney, Marvin*

*E. Frankel, Massillon M. Heuser, Morton Hollander, Herman Marcuse, Lester S. Jayson, Cornelius J. Peck, Eberhard P. Deutsch, Burton K. Philips* and *William I. Connelly.*

MR. JUSTICE REED delivered the opinion of the Court.

Petitioners seek damages from the United States for the death of Henry G. Dalehite in explosions of fertilizer with an ammonium nitrate base, at Texas City, Texas, on April 16 and 17, 1947. This is a test case, representing some 300 separate personal and property claims in the aggregate amount of two hundred million dollars. Consolidated trial was had in the District Court for the Southern District of Texas on the facts and the crucial question of federal liability generally. This was done under an arrangement that the result would be accepted as to those matters in the other suits. Judgment was rendered following separate proof of damages for these individual plaintiffs in the sum of $75,000. Damages in the other claims remain to be determined. The Court of Appeals for the Fifth Circuit unanimously reversed, however, *In re Texas City Disaster Litigation,* 197 F. 2d 771, and we granted certiorari, 344 U. S. 873, because the case presented an important problem of federal statutory interpretation.

The suits were filed under the Federal Tort Claims Act, 28 U. S. C. §§ 1346, 2671–2678, 2680. That Act waived sovereign immunity from suit for certain specified torts of federal employees. It did not assure injured persons damages for all injuries caused by such employees.

The Act provides that the federal district courts, "[s]ubject to the provisions of [the act]," are to have:

> "exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or

loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." § 1346 (b).

There is an exception from the scope of this provision. Section 2680 reads:

"The provisions of this chapter and section 1346 (b) of this title shall not apply to—

"(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

Suing under this grant of jurisdiction, the plaintiffs claimed negligence, substantially on the part of the entire body of federal officials and employees involved in a program of production of the material—Fertilizer Grade Ammonium Nitrate (FGAN hereafter)—in which the original fire occurred and which exploded. This fertilizer had been produced and distributed at the instance, according to the specifications and under the control of the United States.

The adaptability of the material for use in agriculture had been recognized long prior to 1947. The Government's interest in the matter began in 1943 when the TVA, acting under its statutory delegation to undertake experiments and "manufacture" fertilizer, 48 Stat. 61, 16

U. S. C. § 831d, first began production for commercial purposes.[1] TVA used plant facilities formerly used for production of ammonium nitrate for explosives. In the year 1943, the War Production Board, responsible for the production and allocation of war materials, Exec. Order 9024, January 16, 1942, 7 Fed. Reg. 329, instituted a program of yearly production of 30,000 tons a month of FGAN for private domestic agricultural use through plants no longer required for ammunition production. Administration was to be carried on through the Army's Bureau of Ordnance. The TVA specifications were followed and advice given by its experts. This early production for domestic use furnished a test for manufacture and utility of FGAN.

The particular FGAN involved at Texas City came to be produced for foreign use for these reasons: Following the World War II hostilities, the United States' obligations as an occupying power,[2] and the danger of internal unrest, forced this Government to deal with the problem of feeding the populations of Germany, Japan and Korea. Direct shipment of foodstuffs was impractical; available fertilizer was in short supply, and requirements from the United States were estimated at about 800,000 tons. However, some 15 ordnance plants had been deactivated and turned over to the War Assets Administration, 44 CFR, 1949, Part 401, for disposal. Under Secretary of War Royall suggested in May of 1946, and Secretary Patterson agreed, that these be used for production of fertilizer needed for export.[3] The Director of

---

[1] The Hercules Powder Company held the original Cairns Explosive Patent on the FGAN process, which contemplated a product substantially similar to that finally produced by the Government including the use of an organic insulator. See p. 21, *infra.*

[2] The Hague Conventions of 1899 (II) and 1907 (IV) Respecting the Laws and Customs of War on Land, Article 43.

[3] These were capable of producing 70,000 tons a month.

20

the Office of War Mobilization and Reconversion, 58 Stat. 785, 50 U. S. C. App. § 1651 *et seq.* (1946 ed.), acting under the power delegated by the President in Exec. Order 9347, May 27, 1943, 8 Fed. Reg. 7207, and Exec. Order 9488, October 3, 1944, 9 Fed. Reg. 12145, ordered the plants into operation. Cabinet approval followed. The War Department allocated funds from its appropriations for "Supplies" and "Military Posts" for 1946; direct appropriations for relief in the occupied areas were made by Congress in the following year.[4] The Army's Chief of Ordnance was delegated the responsibility for carrying out the plan, and was authorized particularly to enter into cost-plus-fixed-fee contracts with private companies for the operation of the plants' facilities. He in turn appointed the Field Director of Ammunition Plants (FDAP) to administer the program. Thereafter the Department entered into a number of contracts with private firms—including the du Pont Co. and Hercules Powder Co.—to "operate the installation . . . described herein for the graining of ammonium nitrate (fertilizer grade)," but subjecting "the work to be done by the Contractor . . . to the general supervision, direction, control and approval of the Contracting Officer." A detailed set of specifications was drawn up and sent to each plant which included FDAP "Specifications for Products" and a similar TVA paper. Army personnel were appointed for each plant. These were responsible for the application of these specifications, liaison with supply officials,

---

[4] Military Appropriation Act of 1946, 59 Stat. 384, 390, 395 (1945), and Military Appropriation Act of 1947, 60 Stat. 541, 560 (1946). The latter was mentioned as directed toward the fertilizer program. Hearings before a Subcommittee of the Senate Committee on Appropriations on H. R. 6837, 79th Cong., 2d Sess. 16, 85. See also H. J. Res. 153, 61 Stat. 125, May 31, 1947, specifically appropriating moneys for relief assistance of all kinds.

and satisfaction of production schedules, pursuant to an Army Standard Operating Procedure. Beyond this, operations were controlled by the administering corporation which supplied the personnel and production experience required.[5]

FGAN's basic ingredient was ammonium nitrate, long used as a component in explosives. Its adaptability as a fertilizer stemmed from its high free nitrogen content. Hercules Powder Company had first manufactured a fertilizer compound in this form on the basis of Cairns' Explosive Patent, No. 2,211,738, of August 13, 1940. The Cairns process contemplates a product substantially identical to the Texas City FGAN. The process was licensed to the United States. The Government produced ammonium nitrate at certain other federal plants, and shipped it in solution to the reactivated graining centers for concentration. Thereafter, in addition to clay, a mixture of petrolatum, rosin and paraffin (PRP hereafter) was added to insure against caking through water absorption. The material was then grained to fertilizer specification, dried and packaged in 6-ply paper bags, marked "Fertilizer (Ammonium Nitrate)."

At the inception of the program, however, it appeared that these particular plants were unable to produce sufficient quantities of fertilizer to meet the early needs of the planned allocation. So early shipments to the occupied territories were made up of lots privately produced, and released to the War Department by the Combined Food Board and purchased by the United States, pursuant to an allocation arrangement approved by the Board acting through the Civilian Production Administration, established by Exec. Order 9638, October 4, 1945, 10 Fed. Reg. 12591. Thereafter the private producers could

---

[5] By 1946, at least two companies in addition to Hercules were producing FGAN commercially.

replenish their supply for private sale by purchasing government-produced FGAN, if they so desired.

The particular FGAN transported to Texas City had been produced at three of the plants activated by the Government for the foreign fertilizer program, and allotted to the Lion Oil Co., which had previously sold FGAN to the Army pursuant to their sell-back agreement. The agreement provided that title was to pass to Lion on payment. The original contract of sale to the Army having provided that Lion could designate a recipient other than itself for the replacement FGAN, Lion contracted with the Walsen Company for resale. Walsen operated as broker for the French Supply Council representing the French Government which had secured a preferential fertilizer allocation from the Civilian Production Administration. Pursuant thereto Walsen transmitted the French shipping orders to Lion who turned them over to the Army for execution. The FGAN was consigned to the French Supply Council at Texas City by government bills of lading. The Council insured the shipment in its own name, arranged for credit with New York banks and assigned part thereof to Lion, sufficient to cover the shipments here involved, payable on presentation of shipping documents. It also directed Lion to "consign all lots French Supply Council for storage and eventual exportation Texas City Terminal Texas."

By April 15, 1947, following three weeks' warehouse storage at Texas City on orders of the French Council, some 1,850 tons of the FGAN thus resold had been loaded on the French Government-owned steamship *Grandcamp*, and some 1,000 tons on the privately owned *High Flyer* by independent stevedores hired by the French.[6] The *Grandcamp* carried in addition a substan-

---

[6] Seventy-five thousand tons of FGAN had been shipped through Texas City during the previous six months.

tial cargo of explosives, and the *High Flyer* 2,000 tons of sulphur at the time. At about 8:15 a. m. of the next day smoke was sighted in the *Grandcamp* hold and all efforts to halt the fire were unavailing.[7] Both ships exploded and much of the city was leveled and many people killed.

Since no individual acts of negligence could be shown, the suits for damages that resulted necessarily predicated government liability on the participation of the United States in the manufacture and the transportation of FGAN. Following the disaster, of course, no one could fail to be impressed with the blunt fact that FGAN would explode. In sum, petitioners charged that the Federal Government had brought liability on itself for the catastrophe by using a material in fertilizer which had been used as an ingredient of explosives for so long that industry knowledge gave notice that other combinations of ammonium nitrate with other material might explode. The negligence charged was that the United States, without definitive investigation of FGAN properties, shipped or permitted shipment to a congested area without warning of the possibility of explosion under certain conditions. The District Court accepted this theory. His judgment was based on a series of findings of causal negligence which, for our purposes, can be roughly divided into three kinds—those which held that the Government had been careless in drafting and adopting the fertilizer export plan as a whole, those which found specific negligence in various phases of the manufacturing process and those which emphasized official dereliction of duty in failing to

---

[7] The *Grandcamp* exploded about an hour after the fire was noticed. Meanwhile the captain of the ship had ordered all personnel off and the hatches closed. Steam was introduced into the holds. All admit that this is normal fire-fighting procedure aboard ships, but that it was less than effective in this case because of the oxidizing properties of the FGAN. Whether or not the captain was negligent this Court is not called upon to say.

24

police the shipboard loading. The Court of Appeals *en banc* unanimously reversed, but since only three of the six judges explicitly rejected the bulk of these findings, we shall consider the case as one in which they come to us unimpaired. Cf. *Labor Board* v. *Pittsburgh Steamship Co.*, 340 U. S. 498, 503; *United States* v. *United States Gypsum Co.*, 333 U. S. 364, 395. Even assuming their correctness *arguendo,* though, it is our judgment that they do not establish a case within the Act.[8] This is for the reason that as a matter of law the facts found cannot give the District Court jurisdiction of the cause under the Tort Claims Act.

I. The Federal Tort Claims Act was passed by the Seventy-ninth Congress in 1946 as Title IV of the Legislative Reorganization Act, 60 Stat. 842, after nearly thirty years of congressional consideration. It was the offspring of a feeling that the Government should assume the obligation to pay damages for the misfeasance of employees in carrying out its work. And the private bill device was

---

[8] We are therefore not required to weigh each finding anew as "clearly erroneous." They were characterized below as "profuse, prolific, and sweeping." We agree. Fed. Rules Civ. Proc., Rule 52 (a), in terms, contemplates a system of findings which are "of fact" and which are "concise." The well-recognized difficulty of distinguishing between law and fact clearly does not absolve district courts of their duty in hard and complex cases to make a studied effort toward definiteness. Statements conclusory in nature are to be eschewed in favor of statements of the preliminary and basic facts on which the District Court relied. *Kelley* v. *Everglades Drainage District,* 319 U. S. 415, and cases cited. Otherwise, their findings are useless for appellate purposes. In this particular case, no proper review could be exercised by taking the "fact" findings of "negligence" at face value. And, to the extent that they are of law, of course they are not binding on appeal. *E. g., Great Atlantic & Pacific Tea Co.* v. *Supermarket Equipment Corp.,* 340 U. S. 147, 153–154, and concurring opinion at 155–156.

notoriously clumsy.[9]  Some simplified recovery procedure for the mass of claims was imperative.  This Act was Congress' solution, affording instead easy and simple access to the federal courts for torts within its scope.[10]

---

[9] "In the Sixty-eighth Congress about 2,200 private claim bills were introduced, of which 250 became law . . . .

"In the Seventieth Congress 2,268 private claim bills were introduced, asking more than $100,000,000.  Of these, 336 were enacted, appropriating about $2,830,000, of which 144, in the amount of $562,000, were for tort.

"In each of the Seventy-fourth and Seventy-fifth Congresses over 2,300 private claim bills were introduced, seeking more than $100,-000,000.  In the Seventy-sixth Congress approximately 2,000 bills were introduced, of which 315 were approved, for a total of $826,000.

"In the Seventy-seventh Congress, of the 1,829 private claim bills introduced and referred to the Claims Committee, 593 were approved for a total of $1,000,253.30.  In the Seventy-eighth Congress 1,644 bills were introduced; 549 of these were approved for a total of $1,355,767.12."  H. R. Rep. No. 1287, 79th Cong., 1st Sess., p. 2.

[10] Certain tentative experiments in this direction should be noted. In 1855, Congress established the Court of Claims and consented to suit therein on claims based on contract or federal law or regulation.  This consent was enlarged in 1887 to include all cases for damages not sounding in tort.  At the same time, United States District Courts were given concurrent jurisdiction of claims up to $10,000. In 1910, Congress consented to suits in the Court of Claims for patent infringement.  When the Government took over the operation of the railroads during the First World War, Congress made the United States subject to the same responsibility for property damage, personal injury, and death as the private owners would have been.  In 1920 and 1925, the Government consented to suits in the district courts upon admiralty and maritime torts involving government vessels, without limitation as to amount.

From the Committee hearings we learn that the previous 85 years had witnessed a steady encroachment upon the originally unbroken domain of sovereign immunity from legal process for the delicts of its agents.  Yet a large and highly important area remained in which no satisfactory remedy had been provided for the wrongs of government officers or employees, the ordinary "common law" type of tort,

26

The meaning of the governmental regulatory function exception from suits, § 2680 (a), shows most clearly in the history of the Tort Claims Bill in the Seventy-seventh Congress. The Seventy-ninth, which passed the Act, held no relevant hearings. Instead, it integrated the language of the Seventy-seventh Congress, which had first considered the exception, into the Legislative Reorganization Act as Title IV.

Earlier tort claims bills considered by Congress contained reservations from the abdication of sovereign immunity. Prior to 1942 these exceptions were couched in terms of specific spheres of federal activity, such as postal service, the activities of the Securities and Exchange Commission, or the collection of taxes.[11] In 1942, however, the Seventy-seventh Congress drafted a twofold elimination of claims based on the execution of a regulation or statute or on the exercise of a discretionary function. The language of the bills then introduced in both the House and Senate, in fact, was identical with that of § 2680 (a) as adopted.[12] The exception was drafted as a clarifying amendment to the House bill to assure protection for the

such as personal injury or property damage caused by the negligent operation of an automobile. Hearings before the House Committee on the Judiciary on H. R. 5373 and H. R. 6463, 77th Cong., 2d Sess., p. 24.

[11] Such specific exceptions appeared first as an amendment to H. R. 9285, 70th Cong., 1st Sess. The amendment was offered from the floor of the House, 69 Cong. Rec. 3131. See also H. R. 7236 and S. 2690, 76th Cong., 1st Sess.; H. R. 5373, 77th Cong., 2d Sess.

[12] H. R. 6463, 77th Cong., 2d Sess.; S. 2207, 77th Cong., 2d Sess. The first broad governmental exemption was considered in S. 4567, 72d Cong., 1st Sess., and in S. 1833, 73d Cong., 1st Sess., where it was provided that the Government should not be liable for "[a]ny claim on account of the effect or alleged effect of an Act of Congress, Executive order of the President, or of any department or independent establishment."

Government against tort liability for errors in administration or in the exercise of discretionary functions.[13]   An Assistant Attorney General, appearing before the Committee especially for that purpose,[14] explained it as avoiding "any possibility that the act may be construed to authorize damage suits against the Government growing out of a legally authorized activity," merely because "the same conduct by a private individual would be tortious."   It was not "intended that the constitutionality of legislation, the legality of regulations, or the propriety of a discretionary administrative act, should be tested through the medium of a damage suit for tort.   The same holds true of other administrative action not of a regulatory nature, such as the expenditure of Federal funds, the execution of a Federal project and the like." [15]   Referring to a prior bill which had not contained the "discretionary function" exemption, the House Committee on the Judiciary was advised that "the cases embraced within [the new] subsection would have been exempted from [the prior bill] by judicial construction.   It is not probable that the courts would extend a Tort Claims Act into the realm of the validity of legislation or discretionary administrative action, but H. R. 6463 makes this specific." [16]

The legislative history indicates that while Congress desired to waive the Government's immunity from actions for injuries to person and property occasioned by the tortious conduct of its agents acting within their scope of

[13] Hearings before the House Committee on the Judiciary on H. R. 5373 and H. R. 6463, 77th Cong., 2d Sess., pp. 1, 4.

[14] Hearings before the House Committee on the Judiciary, 77th Cong., 2d Sess., on H. R. 5373 and H. R. 6463, p. 6.

[15] Ibid., pp. 25, 33.

[16] Statement by the then Assistant Attorney General Francis M. Shea at Hearings before the Committee on the Judiciary, H. of Rep., 77th Cong., 2d Sess., on H. R. 5373 and H. R. 6463, p. 29.

28

business,[17] it was not contemplated that the Government should be subject to liability arising from acts of a governmental nature or function.[18] Section 2680 (a) draws this distinction. Uppermost in the collective mind of Congress were the ordinary common-law torts.[19] Of these, the example which is reiterated in the course of the repeated proposals for submitting the United States to tort liability is "negligence in the operation of vehicles." [20] On the other hand the Committee's reports explain the boundaries of the sovereign immunity waived, as defined

[17] Hearings before a Subcommittee of the House Committee on Claims, 72d Cong., 1st Sess., on a general tort bill, p. 17; Hearings before Subcommittee No. 1 of the House Committee on the Judiciary on H. R. 7236, 76th Cong., 3d Sess., pp. 5, 16; Hearings before a Subcommittee of the Senate Committee on the Judiciary on S. 2690, 76th Cong., 3d Sess., p. 27; Hearings before the House Committee on the Judiciary on H. R. 5373 and H. R. 6463, 77th Cong., 2d Sess., pp. 28, 37, 39, 66; H. R. Rep. No. 2428, 76th Cong., 3d Sess., p. 3; H. R. Rep. No. 2245, 77th Cong., 2d Sess., p. 10; H. R. Rep. No. 1287, 79th Cong., 1st Sess., p. 5; S. Rep. No. 1400, 79th Cong., 2d Sess., p. 31.

[18] H. R. Rep. No. 2800, 71st Cong., 3d Sess., p. 13; Hearings on H. R. 5373 and H. R. 6463, 77th Cong., 2d Sess., pp. 28, 33, 38, 45, 65–66; S. Rep. No. 1196, 77th Cong., 2d Sess., p. 7; H. R. Rep. No. 1287, 79th Cong., 1st Sess., p. 5; 86 Cong. Rec. 12021–12022.

[19] That congressional thought was centered on granting relief for the run-of-the-mine accidents, as distinguished from injury from performing discretionary governmental functions, is indicated by the message of President Franklin D. Roosevelt in 1942 to the 77th Congress recommending passage of a tort claims statute. The President favored a $7,500 limit on jurisdiction and spoke chiefly of the interference from numerous bills introduced—around two thousand each Congress—and the simplification of procedure for recovery. 88 Cong. Rec. 313–314.

[20] H. R. Rep. No. 2428, 76th Cong., 3d Sess., p. 3; Hearings on H. R. 5373 and H. R. 6463, 77th Cong., 2d Sess., p. 66; Hearings on H. R. 7236, 76th Cong., 3d Sess., pp. 7, 16, 17; Hearings on S. 2690, 76th Cong., 3d Sess., p. 9; 69 Cong. Rec. 2192, 2193, 3118; 86 Cong. Rec. 12024. See also note 8.

by this § 2680 exception, with one paragraph which appears time and again after 1942, and in the House Report of the Congress that adopted in § 2680 (a) the limitation in the language proposed for the 77th Congress.[21] It was adopted by the Committee in almost the

---

[21] See H. R. Rep. No. 2245, 77th Cong., 2d Sess., p. 10; S. Rep. No. 1196, 77th Cong., 2d Sess., p. 7; H. R. Rep. No. 1287, 79th Cong., 1st Sess., pp. 5–6; Hearings before House Com. on Judiciary on H. R. 5373 and H. R. 6463, 77th Cong., 2d Sess., p. 33. The paragraph reads as follows:

"Section 402 specifies the claims which would not be covered by the bill.

"The first subsection of section 402 exempts from the bill claims based upon the performance or nonperformance of discretionary functions or duties on the part of a Federal agency or Government employee, whether or not the discretion involved be abused, and claims based upon the act or omission of a Government employee exercising due care in the execution of a statute or regulation, whether or not valid. This is a highly important exception, intended to preclude any possibility that the bill might be construed to authorize suit for damages against the Government growing out of an authorized activity, such as a flood-control or irrigation project, where no negligence on the part of any Government agent is shown, and the only ground for suit is the contention that the same conduct by a private individual would be tortious, or that the statute or regulation authorizing the project was invalid. It is also designed to preclude application of the bill to a claim against a regulatory agency, such as the Federal Trade Commission or the Securities and Exchange Commission, based upon an alleged abuse of discretionary authority by an officer or employee, whether or not negligence is alleged to have been involved. To take another example, claims based upon an allegedly negligent exercise by the Treasury Department of the blacklisting or freezing powers are also intended to be excepted. The bill is not intended to authorize a suit for damages to test the validity of or provide a remedy on account of such discretionary acts even though negligently performed and involving an abuse of discretion. Nor is it desirable or intended that the constitutionality of legislation, or the legality of a rule or regulation should be tested through the medium of a damage suit for tort. However, the common-law torts of employees of regulatory agencies would be included within the

language of the Assistant Attorney General's explanation. This paragraph characterizes the general exemption as "a highly important exception, intended to preclude any possibility that the bill might be construed to authorize suit for damages against the Government growing out of an authorized activity, such as a flood-control or irrigation project, where no negligence on the part of any Government agent is shown, and the only ground for suit is the contention that the same conduct by a private individual would be tortious . . . . The bill is not intended to authorize a suit for damages to test the validity of or provide a remedy on account of such discretionary acts even though negligently performed and involving an abuse of discretion."

II. Turning to the interpretation of the Act, our reasoning as to its applicability to this disaster starts from the accepted jurisprudential principle that no action lies against the United States unless the legislature has authorized it.[22] The language of the Act makes the United States liable "respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances." 28 U. S. C. § 2674. This statute is another example of the progressive relaxation by legislative enactments of the rigor of the immunity rule. Through such statutes that change the law, organized government

---

scope of the bill to the same extent as torts of nonregulatory agencies. Thus, section 402 (5) and (10), exempting claims arising from the administration of the Trading With the Enemy Act or the fiscal operations of the Treasury, are not intended to exclude such common-law torts as an automobile collision caused by the negligence of an employee of the Treasury Department or other Federal agency administering those functions."

[22] *Feres* v. *United States,* 340 U. S. 135, 139; *United States* v. *Shaw,* 309 U. S. 495; *United States* v. *Eckford,* 6 Wall. 484. Cf. Blackstone, Book I, c. 7 (Sovereignty).

expresses the social purposes that motivate its legislation. Of course, these modifications are entitled to a construction that will accomplish their aim,[23] that is, one that will carry out the legislative purpose of allowing suits against the Government for negligence with due regard for the statutory exceptions to that policy. In interpreting the exceptions to the generality of the grant, courts include only those circumstances which are within the words and reason of the exception.[24] They cannot do less since petitioners obtain their "right to sue from Congress [and they] necessarily must take it subject to such restrictions as have been imposed." *Federal Housing Administration* v. *Burr*, 309 U. S. 242, 251.

So, our decisions have interpreted the Act to require clear relinquishment of sovereign immunity to give jurisdiction for tort actions.[25] Where jurisdiction was clear,

---

[23] *United States* v. *Yellow Cab Co.*, 340 U. S. 543, 555; *Keifer & Keifer* v. *Reconstruction Finance Corporation*, 306 U. S. 381.

[24] *United States* v. *Dickson*, 15 Pet. 141, 165; *Walling* v. *Jacksonville Paper Co.*, 317 U. S. 564, 571; *A. H. Phillips, Inc.* v. *Walling*, 324 U. S. 490, 493.

[25] In *Feres* v. *United States*, 340 U. S. 135, this Court held that the Act did not waive immunity for tort actions against the United States for injuries to three members of the Armed Forces while on active duty. The injuries were allegedly caused by negligence of employees of the United States. The existence of a uniform compensation system for injuries to those belonging to the armed services led us to conclude that Congress had not intended to depart from this system and allow recovery by a tort action dependent on state law. Recovery was permitted by a service man for nonservice disabilities in *Brooks* v. *United States*, 337 U. S. 49.

In *United States* v. *Spelar*, 338 U. S. 217, we held that our courts did not have jurisdiction to try a tort action for injury by a federal employee to a complainant because of an accident at our air base in Newfoundland. This conclusion was reached because of the exception, § 2680 (k), of "Any claim arising in a foreign country." The sovereignty of the United States did not extend over the base.

though, we have allowed recovery despite arguable procedural objections.[26]

One only need read § 2680 in its entirety to conclude that Congress exercised care to protect the Government from claims, however negligently caused, that affected the governmental functions. Negligence in administering the Alien Property Act, or in establishing a quarantine, assault, libel, fiscal operations, etc., was barred. An analysis of § 2680 (a), the exception with which we are concerned, emphasizes the congressional purpose to except the acts here charged as negligence from the authorization to sue.[27] It will be noted from the form of the section, see p. 18, *supra,* that there are two phrases describ-

---

[26] *United States* v. *Aetna Casualty & Surety Co.,* 338 U. S. 366. Insurance Company, as subrogee of the person injured, may bring suit under the Act in spite of Anti-Assignment Statute.

*United States* v. *Yellow Cab Co.,* 340 U. S. 543. United States may be sued for contribution, and also be impleaded as a third party defendant.

[27] The statute is unique in Anglo-American jurisprudence in its explicit exception for discretion. The English Crown Proceedings Act, 1947, contains nothing directly comparable, though see § 11, saving the "prerogative of the Crown," 6 Halsbury's Statutes of England (2d ed.) 56. The extent of this provision is not entirely clear, but 6 Halsbury's Laws of England (2d ed.) 443–590, assumes the term to cover a wide area of official activities, including "the rules and regulations [and] the exercise of discretionary authority" by "the customary officers and departments," under parliamentary enactments. *Ibid.,* 459–460. Street, Tort Liability of the State, 47 Mich. L. Rev. 341, 353, however, seems to indicate that the principal protection for the exercise of official discretion will come through the accepted principles of the common law as to torts of public officials acting within their delegated authority. See also Barnes, The Crown Proceedings Act, 1947, 26 Canadian Bar Review 387, 390, and The Crown Proceedings Act, 1950, 28 New Zealand L. J. 49, 50, 52–53.

Australia and New Zealand had had similar statutes for some years. They left "open to grave doubt how far, if at all, it was intended by those Acts to give the subject rights of action which

ing the excepted acts of government employees. The first deals with acts or omissions of government employees, exercising due care in carrying out statutes or regulations whether valid or not. It bars tests by tort action of the legality of statutes and regulations. The second is applicable in this case. It excepts acts of discretion in the performance of governmental functions or duty "whether or not the discretion involved be abused." Not only agencies of government are covered but all employees exercising discretion.[28] It is clear that the just-quoted clause as to abuse connotes both negligence and wrongful acts in the exercise of the discretion because the Act itself covers only "negligent or wrongful act or omission of any employee," "within the scope of his office" "where the United States, if a private person, would be liable." 28 U. S. C. § 1346 (b). The exercise of discretion could not be abused without negligence or a wrongful act. The Committee reports, note 21, *supra,* show this. They say § 2680 (a) is to preclude action for "abuse of discretionary authority . . . whether or not negligence is alleged to have been involved." They speak of excepting a "remedy on account of such discretionary

---

in the result would interfere seriously with the ordinary administrative work of the Government . . . ." *Enever* v. *The King,* 3 Com. L. R. 969, 988 (1906); see also *Davidson* v. *Walker,* 1 N. S. W. St. R. 196, 208–213 (1901), and *Hawley* v. *Steele,* 6 Ch. D. 521 (quoted therein): " 'In other words, I think the discretion is vested in the executive Government, having authority over military matters, to determine for which, of these various military purposes for which land may fairly be required, the particular land in question is to be appropriated. It is not for the Judge to say that they have made a bad selection.' " 1 N. S. W. St. R. 211.

[28] " 'Employee of the government' includes . . . members of the military or naval forces of the United States, and persons acting on behalf of a federal agency in an official capacity." 28 U. S. C. § 2671.

acts even though negligently performed and involving an abuse of discretion." [29]

So we know that the draftsmen did not intend it to relieve the Government from liability for such common-law torts as an automobile collision caused by the negligence of an employee, see p. 28, *supra,* of the administering agency. We know it was intended to cover more than the administration of a statute or regulation because it appears disjunctively in the second phrase of the section. The "discretion" protected by the section is not that of the judge—a power to decide within the limits of positive rules of law subject to judicial review. It is the discretion of the executive or the administrator to act according to one's judgment of the best course, a concept of substantial historical ancestry in American law.[30]

This contention is met by petitioners with these arguments:

> "To accept the foregoing close and narrow reasoning [of the Court of Appeals], which is unrealistic, is to say that a program and undertaking and operation, however like it may be to some private corporation or operation such as the manufacture of an explosive, is nevertheless throughout discretionary, if the concept thereof is born in discretion. . . .

---

[29] Indeed, it has been so held by those district courts which have dismissed complaints charging negligence, following the Government's confession and avoidance plea that the acts alleged to be culpable fell within the exception. *E. g., Boyce* v. *United States,* 93 F. Supp. 866; *Coates* v. *United States,* 181 F. 2d 816; *Denny* v. *United States,* 171 F. 2d 365; *Olson* v. *United States,* 93 F. Supp. 150; *Toledo* v. *United States,* 95 F. Supp. 838; *Thomas* v. *United States,* 81 F. Supp. 881.

[30] It seems sufficient to cite *Marbury* v. *Madison,* 1 Cranch 137, 170; *Spalding* v. *Vilas,* 161 U. S. 483, 498; *Alzua* v. *Johnson,* 231 U. S. 106; *Louisiana* v. *McAdoo,* 234 U. S. 627, 633; *Perkins* v. *Lukens Steel Co.,* 310 U. S. 113, 131.

Petitioners assert that in the manufacturing . . . of FGAN, . . . the Government was not charged with any discretionary function or opportunity of discretion, but was charged with the duty of due and reasonable care.

"This Court has always applied the theory of discretionary function only to the executive and legislative levels, and has made such function the basis of freedom from interference by the courts a personal one to the particular executive or the legislative branch. Such discretionary function may not be delegated down to subordinates and to others."

"The Government's argument, adopted by Judge Rives, is that the responsible Government employees were choosing between alternative courses of action in the steps they took. . . . The argument is that the alleged negligence was in the exercise of 'discretion' simply because it involved a choice.

.    .    .    .    .

"The negligence involved here was far removed from any Cabinet decision to provide aid to Germans and Japanese. . . . It is directed only to the mistakes of judgment and the careless oversight of Government employees who were carrying out a program of manufacturing and shipping fertilizer and who failed to concern themselves as a reasonable man should with the safety of others. . . . Congress delegated to Ordnance no 'discretion' thus to commit wrong."

It is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that the "discretionary function or duty" that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or ad-

ministrators in establishing plans, specifications or schedules of operations.[31] Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable. If it were not so, the protection of § 2680 (a) would fail at the time it would be needed, that is, when a subordinate performs or fails to perform a causal step, each action or nonaction being directed by the superior, exercising, perhaps abusing, discretion.[32]

---

[31] There are, of course, American state cases which are premised on a similar policy judgment, *e. g., Barrett* v. *State of New York,* 220 N. Y. 423, 116 N. E. 99; *Goldstein* v. *State of New York,* 281 N. Y. 396, 24 N. E. 2d 97. Similarly in England the courts have been wary not to penalize discretionary acts of public bodies. One of the more interesting cases in the field is *East Suffolk Rivers Catchment Board* v. *Kent,* [1941] A. C. 74, involving certain allegedly negligent activities by the Board in draining inundated lands of the private plaintiffs. Lord Romer stated that the Board, under its enabling act, merely had the power to drain; "whether or not they should exercise that power was a matter entirely within their own discretion." "I know of no authority for the proposition that in selecting the time within which, the extent to which, and the method by which its statutory power is to be exercised [the Board] owes any duty whatsoever." *Ibid.,* at 97, 98. See also *Sheppard* v. *Glossop Corporation,* [1921] 3 K. B. 132: "[the statute] leaves it to [the Corporation's] discretion whether they will light the district or any part of it, and how long the lamps shall be kept lit in any portion of the district which they elect to light." See also *Whiting* v. *Middlesex County Council,* [1948] 1 K. B. 162.

[32] The courts that have passed upon the application of § 2680 (a) to suits under the Tort Claims Act have interpreted the exception of discretionary functions, generally, in conformity with our holding that negligence in policies or plans for authorized governmental activities cannot support damage suits.

Plaintiff in *Boyce* v. *United States,* 93 F. Supp. 866, charged that he had suffered damage by virtue of certain governmentally-conducted blasting operations. The United States, by way of affirmative defense, showed that the blasting had been conducted pursuant to detailed plans and specifications drawn by the Chief of Engineers who,

III. That the cabinet-level decision to institute the fertilizer export program was a discretionary act is not seriously disputed. Nor do we think that there is any doubt that the need for further experimentation with FGAN to determine the possibility of its explosion, under

in turn, had been specifically delegated "discretion of the broadest character" to draft a plan for deepening the Mississippi River channel. The exception was applied. There have been several cases of like import dealing with the execution of waterway projects. In *Coates* v. *United States*, 181 F. 2d 816, damages were sought for injury to crops and land from action of the Government in negligently changing the course of the Missouri. It was held that no jurisdiction existed under the Act. The case was followed in *North* v. *United States*, 94 F. Supp. 824. There the plaintiff was denied recovery for injury to his cellar and cesspool occasioned by a government dam having raised the level of the local ground water. A like result obtained in *Lauterbach* v. *United States*, 95 F. Supp. 479, where claimant sued to recover damages resulting from release of flood waters at Bonneville Dam.

*Olson* v. *United States*, 93 F. Supp. 150, involved another claim of water damage. In that case, employees of the Fish and Wildlife Service were alleged to have "wilfully and intentionally opened the flood gates" of a certain dam, causing loss of plaintiff's livestock. The dam was operated for "the purpose of storing water for the propagating of fish and wildlife" and the court held that *"when* flood waters are to be released and *how much* water is to be released certainly calls for the exercise of judgment." 93 F. Supp., at 151, 152–153. *Sickman* v. *United States*, 184 F. 2d 616, also invoked § 2680 (a). There plaintiff unsuccessfully sought recovery for crop depredations by wild birds induced to feed on his land by a nearby governmental game preserve.

In *Toledo* v. *United States*, 95 F. Supp. 838, plaintiff's automobile had been damaged by a partially rotten tree falling perchance at a time when he had parked under it. The tree had been planted and grown at a government plant experimental station in Puerto Rico. It was open to the public for instruction and observation. The opinion holds that the operation of the station itself, and the decision to plant and preserve this particular tree to further its experimental purposes, were "peculiarly within the discretion of the appropriate employees of the Station," but that negligent removal would not have been. 95 F. Supp., at 841.

38

conditions likely to be encountered in shipping, and its combustibility was a matter to be determined by the discretion of those in charge of the production. Obviously, having manufactured and shipped the commodity FGAN for more than three years without even minor accidents, the need for further experimentation was a matter of discretion. Reported instances of heating or bag damage were investigated and experiments, to the extent deemed necessary, were carried on. In dealing with ammonium nitrate in any form, the industry, and of course Ordnance, were well aware that care must be taken. The best indication of the care necessary came from experience in FGAN production. The TVA had produced FGAN since 1943, and their experience, as we have indicated, pp. 18–20, was not only available to Ordnance but was used by them to the most minute detail. It is, we think, just such matters of governmental duties that were excepted from the Act.

We turn, therefore, to the specific acts of negligence charged in the manufacture. Each was in accordance with, and done under, specifications and directions as to how the FGAN was produced at the plants. The basic "Plan" was drafted by the office of the Field Director of Ammunition Plants in June, 1946, prior to beginning production.[33] It was drawn up in the light of prior experience by private enterprise and the TVA. In fact it was, as we have pointed out, based on the latter agency's en-

---

[33] This Plan "contains a tabulation of the installations involved together with pertinent information on those installations for use both in this part and in connection with Part 400; rates of production; description of production processes; information on inspection and acceptance; and information on shipping and storage. This part does not include requirements for the production facilities, recommendations for the operation of these facilities, and problems and methods involved in their administration, which are covered in succeeding parts."

gineering techniques, and specifically adopted the TVA process description and specifications.[34] This Plan was distributed to the various plants at the inception of the program.

Besides its general condemnation of the manufacture of FGAN, the District Court cited four specific acts of negligence in manufacture.[35] Each of these acts looked upon as negligence was directed by this Plan. Applicable excerpts follow. Bagging temperature was fixed.[36] The type of bagging [37] and the labeling thereof [38] were also established. The PRP coating, too, was included in the specifications.[39] The acts found to have

---

[34] "The provisions of this chapter and section 1346 (b) of this title shall not apply to . . . any claim arising from the activities of the Tennessee Valley Authority." 28 U. S. C. § 2680 (l).

[35] See Appendix, p. 45, this opinion.

[36] "Water shall be turned off and discharging of kettle commenced when temperature reaches 200° F."

The relevance of the bagging temperature apparently stemmed from certain testimony that large masses of FGAN, if maintained at temperatures of around 300° F., might spontaneously ignite under certain conditions of mass and confinement. The Government proffered extensive evidence, however, that the FGAN shipped to Texas City did not leave the plants at nearly that temperature, and of course there is no evidence as to the temperature at which it was loaded on the ships.

[37] *Packaging.* Ammonium nitrate for fertilizer shall be packed 100 lbs. per bag. Moisture proof paper or burlap bags, as described below, shall be used. (Specifications as to size may have to be altered to meet the manufacturer's requirement)." Then follow detailed specifications.

[38] Marking: Fertilizer (Ammonium Nitrate) 32.5% Nitrogen.

Notice of contents appeared on the bill of lading, so far as important, as follows: 1,000 Bags, Fertilizing Compounds (manufactured fertilizer) NOIBN, dry in paper bags.

[39] "The PRP mixture is composed of one part paraffin, three parts rosin, and one part petrolatum, thoroughly mixed and melted. This provides a coating which repels moisture and holds the clay in place around each granule."

been negligent were thus performed under the direction of a plan developed at a high level under a direct delegation of plan-making authority from the apex of the Executive Department. The establishment of this Plan, delegated to the Field Director's Office, *supra*, p. 20, [clearly required the exercise of expert judgment.]

This is to be seen, for instance, in the matter of the coating. The PRP was added in order to insure against water absorption. At stake was no mere matter of taste; ammonium nitrate when wet cakes and is difficult to spread on fields as a fertilizer. So the considerations that dictated the decisions were crucial ones, involving the feasibility of the program itself, balanced against present knowledge of the effect of such a coating and the general custom of similar private industries.

And, assuming that high bagging temperatures in fact obtained as the District Court found, the decision to bag at the temperature fixed was also within the exception. Maximum bagging temperatures were first established under the TVA specifications. That they were the product of an exercise of judgment, requiring consideration of a vast spectrum of factors, including some which touched directly the feasibility of the fertilizer export program, is clear. For instance, it appears several times in the record that the question of bagging temperatures was discussed by the Army plant officials, among others. In January, 1947, the Bureau of Explosives of the Association of American Railroads wrote to Ordnance concerning a boxcar fire of FGAN. The letter suggested a reduction of bagging temperatures. The Field Director of Ammunition Plants consulted the commanding officers on the matter. Those of two of the plants which manufactured the Texas City FGAN replied that loading was effected at about 200°. Both, however, recommended that reduced temperatures would be inadvisable. It would be possible to keep the product in graining kettles for a longer

period or to install cooling equipment. But both methods would result in greatly increased production costs and/or greatly reduced production. This kind of decision is not one which the courts, under the Act, are empowered to cite as "negligence"; especially is this so in the light of the contemporary knowledge of the characteristics of FGAN.[40]

As well, serious judgment was involved in the specification of the bag labels and bills of lading. The importance of this rests on the fact that it is the latest point in time and geography when the Government did anything directly related to the fire, for after bagging the FGAN was of course physically in the hands of various non-governmental agents. So, since there was serious room for speculation that the most direct operative fact causing the immediate fire on the *Grandcamp* arose from errors that the French Council, longshoremen or ship staff committed, it was and is important for the petitioners to emphasize the seriousness of the alleged labeling mistake.

This, too, though, falls within the exception for acts of discretion. The Plan had been prepared in this regard

---

[40] Captain Hirsch, commanding one of the three plants which manufactured the Texas City FGAN, wrote to the Field Director's Office requesting "that your office stipulate a maximum temperature at which fertilizer may be loaded in order to eliminate" bag deterioration through heat. In reply, the Office stated that it "has had discussions concerning a loading temperature lower than 200° F. for ammonium nitrate fertilizer, but it is felt that this is a matter of process control and not properly an item to be incorporated into specifications." Hirsch interpreted this as meaning that "this facility should not take any active interest in the condition that the ammonium nitrate fertilizer reaches its destination." In reply from the Field Director's Office, this was labeled a "distortion of our statement concerning the bagging temperature as a matter of process control into indifference to any aspect of acceptability or suitability." The specifications were left unchanged as to bags or bagging temperatures.

by the Transportation Officer of the Director's Office. His decision in the matter was dictated by the ICC regulations. These did not provide for a specific classification for the material other than as fertilizer. Labeling it as anything but "oxidizing material" was not required—indeed was probably forbidden—and even this requirement was waived for bags of less than 200 pounds. To the extent, then, that the Army had a choice in the matter, its decision not to seek to list its FGAN in any other fashion was within the exception. The immunity of a decision as to labeling, in fact, is quite clearly shown by the fact that the ICC's regulations, for instance, could not be attacked by claimants under the Act by virtue of the first phrase of § 2680 (a).

In short, the alleged "negligence" does not subject the Government to liability. The decisions held culpable were all responsibly made at a planning rather than operational level and involved considerations more or less important to the practicability of the Government's fertilizer program.

"There must be knowledge of a danger, not merely possible, but probable," *MacPherson* v. *Buick Motor Co.*, 217 N. Y. 382, 389, 111 N. E. 1050, 1053. Here, nothing so startling was adduced. The entirety of the evidence compels the view that FGAN was a material that former experience showed could be handled safely in the manner it was handled here. Even now no one has suggested that the ignition of FGAN was anything but a complex result of the interacting factors of mass, heat, pressure and composition.

IV. The findings of negligence on the part of the Coast Guard in failing to supervise the storage of the FGAN, and in fighting the fire after it started, were rejected by a majority of the Court of Appeals. 197 F. 2d, at 777, 780, 781. We do not enter into an examination of these

factual findings. We prefer, again, to rest our decision on the Act.

The District Court's holding that the Coast Guard and other agencies were negligent in failing to prevent the fire by regulating storage or loading of the fertilizer in some different fashion is like his specific citations of negligence discussed above. They are classically within the exception. "The power to adopt regulations or by-laws . . . for the preservation of the public health, or to pass ordinances prescribing and regulating the duties of policemen and firemen . . . are generally regarded as discretionary, because, in their nature, they are legislative." *Weightman* v. *Corporation of Washington,* 1 Black 39, 49. The courts have traditionally refused to question the judgments on which they are based. *Zywicki* v. *Jos. R. Foard Co.,* 206 F. 975; *Gutowski* v. *Mayor of Baltimore,* 127 Md. 502, 96 A. 630; *State* v. *General Stevedoring Co.,* 213 F. 51.

As to the alleged failure in fighting the fire, we think this too without the Act. The Act did not create new causes of action where none existed before.

> ". . . the liability assumed by the Government here is that created by 'all the circumstances,' not that which a few of the circumstances might create. We find no parallel liability before, and we think no new one has been created by, this Act. Its effect is to waive immunity from recognized causes of action and was not to visit the Government with novel and unprecedented liabilities." *Feres* v. *United States,* 340 U. S. 135, 142.

It did not change the normal rule that an alleged failure or carelessness of public firemen does not create private actionable rights. Our analysis of the question is determined by what was said in the *Feres* case. See 28 U. S. C. §§ 1346 and 2674. The Act, as was there stated,

limited United States liability to "the same manner and to the same extent as a private individual under like circumstances." 28 U. S. C. § 2674. Here, as there, there is no analogous liability; in fact, if anything is doctrinally sanctified in the law of torts it is the immunity of communities and other public bodies for injuries due to fighting fire. This case, then, is much stronger than *Feres*. We pointed out only one state decision which denied government liability for injuries incident to service to one in the state militia. That cities, by maintaining fire-fighting organizations, assume no liability for personal injuries resulting from their lapses is much more securely entrenched. The Act, since it relates to claims to which there is no analogy in general tort law, did not adopt a different rule. See *Steitz* v. *City of Beacon*, 295 N. Y. 51, 64 N. E. 2d 704. To impose liability for the alleged nonfeasance of the Coast Guard would be like holding the United States liable in tort for failure to impose a quarantine for, let us say, an outbreak of foot-and-mouth disease.

V. Though the findings of specific and general negligence do not support a judgment of government liability, there is yet to be disposed of some slight residue of theory of absolute liability without fault. This is reflected both in the District Court's finding that the FGAN constituted a nuisance, and in the contention of petitioners here. We agree with the six judges of the Court of Appeals, 197 F. 2d 771, 776, 781, 786, that the Act does not extend to such situations, though of course well known in tort law generally. It is to be invoked only on a "negligent or wrongful act or omission" of an employee. Absolute liability, of course, arises irrespective of how the tortfeasor conducts himself; it is imposed automatically when any damages are sustained as a result of the decision to engage in the dangerous activity. The degree of care used in performing the activity is irrelevant to the application of that

doctrine. But the statute requires a negligent act. So it is our judgment that liability does not arise by virtue either of United States ownership of an "inherently dangerous commodity" or property, or of engaging in an "extra-hazardous" activity. *United States* v. *Hull*, 195 F. 2d 64, 67.

Petitioners rely on the word "wrongful" though as showing that something in addition to negligence is covered. This argument, as we have pointed out, does not override the fact that the Act does require some brand of misfeasance or nonfeasance, and so could not extend to liability without fault; in addition, the legislative history of the word indicates clearly that it was not added to the jurisdictional grant with any overtones of the absolute liability theory. Rather, Committee discussion indicates that it had a much narrower inspiration: "trespasses" which might not be considered strictly negligent. Hearings before a Subcommittee of the Senate Committee on the Judiciary on S. 2690, 76th Cong., 3d Sess. 43–44. Had an absolute liability theory been intended to have been injected into the Act, much more suitable models could have been found, see *e. g.,* the Suits in Admiralty Act, 41 Stat. 525, 46 U. S. C. §§ 742–743, in regard to maintenance and cure. Street, Tort Liability of the State: The Federal Tort Claims Act and the Crown Proceedings Act, 47 Mich. L. Rev. 341, 350.

*Affirmed.*

MR. JUSTICE DOUGLAS and MR. JUSTICE CLARK took no part in the consideration or decision of this case.

APPENDIX TO OPINION OF THE COURT.

The District Court's analysis of the specific aspects of the manufacture was foreshadowed by his theory of the foreseeability of the risk which he set out early in the findings. His first finding of fact contained these words: "This record discloses blunders, mistakes, and

acts of negligence, both of omission and commission, on the part of Defendant, its agents, servants, and employees, in deciding to begin the manufacture of this inherently dangerous Fertilizer." It was his conclusion that, through early experiments, the United States had "learned many facts, but did not pursue such investigation far enough to learn all the facts, . . . . What facts it did learn, however, were sufficient to give Defendant knowledge and to put Defendant on notice, and if not, then upon inquiry that would if pursued, have led to knowledge and notice that such Fertilizer which it decided to and began to manufacture was an inherently dangerous and hazardous material, a dangerous explosive, and a fire hazard. Such facts learned by Defendant pointed to and showed that such Fertilizer should not be manufactured, in that it was, under certain conditions and circumstances, most dangerous to everyone handling it in any way and to the public. Yet Defendant's servants, agents and employees, in whose hands Defendant had left the matter, negligently went forward in the manufacture, handling, distribution, shipping, etc. of such Fertilizer. . . .

"After the manufacture and/or the shipping, distribution, and handling of Fertilizer had begun, there were experiments, events and incidents of which Defendant knew, or of which Defendant could have known by the use of the diligence of a reasonable prudent person, showing such Fertilizer to be very dangerous, both from the standpoint of fire and explosion. With this knowledge, Defendant should have ceased the manufacture and sale of such Fertilizer, or should have taken steps to insure the safety of persons manufacturing and handling such Fertilizer and the public. . . ."

"Defendant in manufacturing such Fertilizer, and particularly the Fertilizer on the Grandcamp and High Flyer, did so by a Formula made and evolved by Defendant or under its direction. It used as a coating of such Fertilizer, a substance or substances which rendered same highly susceptible to fire or explosion. There were various types of coating, but the coating finally used made the Fertilizer a very dangerous explosive and fire hazard. More than any other one thing, I think this coating made this commodity one of the most dangerous of explosives, . . . ."

". . . Such Fertilizer was by Defendant, or under it[s] direction, placed or sacked in bags made from paper or other substances which were easily ignited by contact with fire or by spontaneous combustion or spontaneous ignition of the Fertilizer. Such bags also became torn and ragged in shipping and particles of the bags became mixed with

the Fertilizer and rendered same more dangerous and more susceptible to fire and explosion."

". . . Such Fertilizer was placed and packed in bags at high degrees of temperature, which temperature rendered the Fertilizer more susceptible to fire and explosion. Such Fertilizer was so packed that it did not cool, but continued at high temperature while being shipped. This was particularly true of the Fertilizer which exploded on the Steamships Grandcamp and High Flyer. Same was packed in sacks at a high degree of temperature, which temperature continued with only slight reduction, if any, when the Fertilizer was shipped across the nation to Texas City and there loaded onto such Steamships."

"Defendant was negligent in the manner in which it marked and labelled such sacks of Fertilizer, including the Fertilizer on the Grandcamp and High Flyer, in that same was not labelled and marked as a dangerous explosive and fire hazard as required by the Rules and Regulations of the Interstate Commerce Commission. . . .

". . . It was the duty of Defendant, well knowing as it did the dangerous nature and character of such Fertilizer which Defendant shipped or caused to be shipped to Texas City, to notify and advise all the carriers handling same, including the Steamships Grandcamp and High Flyer, and to notify and advise the City and State Officers at Texas City, of the dangerous nature and character of such Fertilizer, to the end that such carriers and their employees and such officers could, if possible protect themselves and the public against the danger of fires from and explosions of such Fertilizer."

The District Court concluded:

"Clearly such Fertilizer ought never to have been manufactured. From the beginning on down, it was a dangerous commodity and a dangerous nuisance."

MR. JUSTICE JACKSON, joined by MR. JUSTICE BLACK and MR. JUSTICE FRANKFURTER, dissenting.

All day, April 15, 1947, longshoremen loaded bags of ammonium nitrate fertilizer aboard the S. S. *Grandcamp,* docked at Texas City, Texas. Shortly after 8 a. m. next morning, when work resumed, smoke was seen coming from the No. 4 hold and it was discovered that fire had broken out in the fertilizer. The ship's master ordered

48

the hatch covered and battened down, and steam was introduced into the hold. Local fire-fighting apparatus soon arrived, but the combined efforts to extinguish the fire were unavailing. Less than an hour after smoke was first seen, 880 tons of fertilizer in the No. 4 hold exploded and, in turn, detonated the fertilizer stored in the No. 2 hold. Fire spread to the dock area of Texas City and to the S. S. *High Flyer,* berthed at an adjoining pier and carrying a cargo of sulphur and ammonium nitrate fertilizer. Further efforts to extinguish or even contain the fire failed and, about 11 p. m., tugs unsuccessfully attempted to tow the *High Flyer* out to sea. Shortly after one o'clock on the morning of April 17, the sulphur and fertilizer aboard the *High Flyer* exploded, demolishing both that ship and the S. S. *Wilson B. Keene,* lying alongside. More than 560 persons perished in this holocaust, and some 3,000 were injured. The entire dock area of a thriving port was leveled and property damage ran into millions of dollars.

This was a man-made disaster; it was in no sense an "act of God." The fertilizer had been manufactured in government-owned plants at the Government's order and to its specifications. It was being shipped at its direction as part of its program of foreign aid. The disaster was caused by forces set in motion by the Government, completely controlled or controllable by it. Its causative factors were far beyond the knowledge or control of the victims; they were not only incapable of contributing to it, but could not even take shelter or flight from it.

Over 300 suits were brought against the United States under the Federal Tort Claims Act, alleging that its negligence was responsible for the disaster. After consolidating the suits, the District Court ordered the case of the present petitioners to be tried. The parties to all of the suits, in effect, agreed that the common issue of the

Government's negligence should abide the outcome of this test litigation. The Court of Appeals for the Fifth Circuit reversed the trial court's judgment in favor of petitioners.[1] Supporting that reversal, the Government here urges that (1) a private person would not be liable in these circumstances, and (2) even if a private person were liable, the Government is saved from liability by the statute's exception of discretionary acts.[2]

This is one of those cases that a judge is likely to leave by the same door through which he enters. As we have been told by a master of our craft, *"Some theory of liability, some philosophy of the end to be served by tightening or enlarging the circle of rights and remedies, is at the root of any decision in novel situations when analogies are equivocal and precedents are silent."* [3] So, we begin by avowing a conception of the function of legal liability in cases such as this quite obviously at variance with the approach of the Court.

Congress has defined the tort liability of the Government as analogous to that of a private person. Traditionally, one function of civil liability for negligence is to supply a sanction to enforce the degree of care suitable to the conditions of contemporary society and appropriate to the circumstances of the case. The civil damage action, prosecuted and adjusted by private initiative, neither burdening our overworked criminal processes nor confined by the limits of criminal liability, is one of the law's most effective inducements to the watchfulness and prudence necessary to avoid calamity from hazardous operations in the midst of an unshielded populace.

Until recently, the influence of the Federal Government has been exerted in the field of tort law to tighten liabil-

---

[1] *In re Texas City Disaster Litigation*, 197 F. 2d 771.

[2] 28 U. S. C. § 2680.

[3] Cardozo, The Growth of the Law, p. 102. (Emphasis his own.)

ity and liberalize remedies.[4]   Congress has even imposed
criminal liability without regard to knowledge of danger
or intent where potentially dangerous articles are intro-
duced into interstate commerce.[5]   But, when the Gov-
ernment is brought into court as a tort defendant, the
very proper zeal of its lawyers to win their case and the
less commendable zeal of officials involved to conceal or
minimize their carelessness militate against this trend.
The Government, as a defendant, can exert an unctuous
persuasiveness because it can clothe official carelessness
with a public interest.   Hence, one of the unanticipated
consequences of the Tort Claims Act has been to throw
the weight of government influence on the side of lax
standards of care in the negligence cases which it defends.

It is our fear that the Court's adoption of the Gov-
ernment's view in this case may inaugurate an unfortu-
nate trend toward relaxation of private as well as official
responsibility in making, vending or transporting inher-
ently dangerous products.   For we are not considering
here everyday commodities of commerce or products of
nature but a complex compound not only proven by

---

[4] See, e. g., the Federal Employers' Liability Act, 45 U. S. C. § 51
et seq., which abolished the defense of assumption of risk and changed
contributory negligence from a complete bar to recovery to a factor
which mitigated damages; the Jones Act, 46 U. S. C. § 688 et seq.,
which gave a cause of action against their employers to seamen,
under the substantive rules of the F. E. L. A.; the Federal Employees'
Compensation Act of 1916, 5 U. S. C. § 751 et seq., in which the
Government set up a compensation system for its own employees;
the Longshoremen's and Harbor Workers' Compensation Act, 33
U. S. C. § 901 et seq., which sets up a system of workmen's com-
pensation for the described employees and imposes liability without
fault on their employers.   In cases arising under the last-named Act,
the Government is a party to judicial review of any award, repre-
senting the interests of the claimant.   See O'Leary v. Brown-Pacific-
Maxon, Inc., 340 U. S. 504.

[5] Boyce Motor Lines v. United States, 342 U. S. 337.

the event to be highly dangerous, but known from the beginning to lie somewhere within the range of the dangerous. Ammonium nitrate, as the Court points out, had been "long used as a component in explosives." This grade of it was manufactured under an explosives patent, in plants formerly used for the manufacture of ordnance, under general supervision of the Army's Chief of Ordnance, and under the local direction of the Army's Field Director of Ammunition Plants. Advice on detailed operations was sought from such experienced commercial producers of high explosives as the du Ponts and the Atlas and the Hercules powder concerns. There is not the slightest basis for any official belief that this was an innocuous product.

Because of reliance on the reservation of governmental immunity for acts of discretion, the Court avoids direct pronouncement on the duty owing by the Government under these circumstances but does sound overtones and undertones with which we disagree. We who would hold the Government liable here cannot avoid consideration of the basic criteria by which courts determine liability in the conditions of modern life. This is a day of synthetic living, when to an ever-increasing extent our population is dependent upon mass producers for its food and drink, its cures and complexions, its apparel and gadgets. These no longer are natural or simple products but complex ones whose composition and qualities are often secret. Such a dependent society must exact greater care than in more simple days and must require from manufacturers or producers increased integrity and caution as the only protection of its safety and well-being. Purchasers cannot try out drugs to determine whether they kill or cure. Consumers cannot test the youngster's cowboy suit or the wife's sweater to see if they are apt to burst into fatal flames. Carriers, by land or by sea, cannot experiment with the combustibility of

52

goods in transit. Where experiment or research is necessary to determine the presence or the degree of danger, the product must not be tried out on the public, nor must the public be expected to possess the facilities or the technical knowledge to learn for itself of inherent but latent dangers. The claim that a hazard was not foreseen is not available to one who did not use foresight appropriate to his enterprise.

Forward-looking courts, slowly but steadily, have been adapting the law of negligence to these conditions.[6] The law which by statute determines the Government's liability is that of the place where the negligent act or omission

---

[6] Judge Lummus, for the Supreme Judicial Court of Massachusetts, articulated this development in *Carter* v. *Yardley & Co., Ltd.*, 319 Mass. 92, 64 N. E. 2d 693. That opinion contains what is perhaps a more decisive statement of the trend than does the earlier landmark opinion of Judge Cardozo for the New York Court of Appeals, *MacPherson* v. *Buick Motor Co.*, 217 N. Y. 382, 111 N. E. 1050. The following cases represent examples of the type of claims based on damage from complex manufactured products which come before appellate tribunals in the present day. *Coleman Co.* v. *Gray*, 192 F. 2d 265 (absence of safety device on gasoline vapor pressing iron); *Roettig* v. *Westinghouse Mfg. Co.*, 53 F. Supp. 588 (explosion of heating unit in electric stove); *Escola* v. *Coca Cola Bottling Co. of Fresno*, 24 Cal. 2d 453, 150 P. 2d 436 (defect in Coca Cola bottle); *Gall* v. *Union Ice Co.*, 108 Cal. App. 2d 303, 239 P. 2d 48 (absence of warning label on drum of sulfuric acid which burst); *Lindroth* v. *Walgreen Co.*, 407 Ill. 121, 94 N. E. 2d 847 (defective vaporizer which melted, causing fire which burned plaintiff); *Ebers* v. *General Chemical Co.*, 310 Mich. 261, 17 N. W. 2d 176 (damage from chemical designed to kill peach-tree borers); *Willey* v. *Fyrogas Co.*, 363 Mo. 406, 251 S. W. 2d 635 (defect in automatic cutoff valves on gas heater); *Di Vello* v. *Gardner Machine Co.* (Ohio Com. Pl.), 102 N. E. 2d 289 (disintegrating grinding wheel); *Saena* v. *Zenith Optical Co.*, 135 W. Va. 795, 65 S. E. 2d 205 (exploding glass coffee maker). Recovery was not had in all of these cases, but all of them have emphasized that the manufacturer owes some duty of care to certain classes of people who might be injured by defects in his product.

occurred.[7]  This fertilizer was manufactured in Iowa and Nebraska, thence shipped to Texas.  Speculation as to where the negligence occurred is unnecessary, since each of these jurisdictions recognizes the general proposition that a manufacturer is liable for defects in his product which could have been avoided by the exercise of due care.[8]  Where there are no specific state decisions on the point, federal judges may turn to the general doctrines of accepted tort law, whence state judges derive their governing principles in novel cases.  We believe that whatever the source to which we look for the law of this case, if the source is as modern as the case itself, it supports the exaction of a higher degree of care than possibly can be found to have been exercised here.

We believe it is the better view that whoever puts into circulation in commerce a product that is known or even suspected of being potentially inflammable or explosive is under an obligation to know his own product and to ascertain what forces he is turning loose.  If, as often will be the case, a dangerous product is also a useful one, he is under a strict duty to follow each step of its distribution with warning of its dangers and with information and directions to keep those dangers at a minimum.

---

[7] 28 U. S. C. § 1346.

[8] *McAfee* v. *Travis Gas Corp.*, 137 Tex. 314, 153 S. W. 2d 442; *Texas Drug Co.* v. *Caldwell* (Tex. Civ. App.), writ dismissed, 237 S. W. 968; *Tegler* v. *Farmers Union Gas & Oil Co.*, 124 Neb. 336, 246 N. W. 721.  As recently as 1949, Circuit Judge Duffy, in discussing Iowa law which was applicable in a diversity suit in federal court, said that the Supreme Court of Iowa had not yet passed squarely on the question, but was of the opinion that they would follow the weight of authority. *Anderson* v. *Linton,* 178 F. 2d 304.  An older Iowa case imposes a duty of care on dealers in potentially dangerous substances, at least as to those in contractual privity, *Ellis* v. *Republic Oil Co.*, 133 Iowa 11, 110 N. W. 20; and even the Government here does not rely on the absence of contractual privity to bar petitioners from recovery.

54

It is obvious that the Court's only choice is to hold the Government's liability to be nothing or to be very heavy, indeed. But the magnitude of the potential liability is due to the enormity of the disaster and the multitude of its victims. The size of the catastrophe does not excuse liability but, on its face, eloquently pleads that it could not have resulted from any prudently operated government project, and that injury so sudden and sweeping should not lie where it has fallen. It should at least raise immediate doubts whether this is one of those "discretionary" operations Congress sought to immunize from liability. With this statement of our general approach to the liability issue, we turn to its application to this case.

In order to show that even a private person would not be liable, the Government must show that the trial court's findings of fact are clearly erroneous.[9] It points to what it claims are patent errors in the lengthy findings made upon a record of over 30,000 pages in 39 printed volumes and apparently urges upon us a rule of *"error in uno, error in omnibus."* We cannot agree that some or even many errors in a record such as this will impeach all of the findings. We conclude that each individual finding must stand or fall on the basis of the evidence to support it. The trial judge found that the explosions resulted from a fire in the fertilizer which had started by some process akin to spontaneous combustion, and that the Government was negligent in failing to anticipate and take precautions against such an occurrence.

The Government's attack on the purely factual determination by the trial judge seems to us utterly unconvincing. Reputable experts testified to their opinion that the fire could have been caused by spontaneous combustion. The Government's contention that it was

---

[9] Rule 52 (a), Fed. Rules Civ. Proc.

probably caused by someone smoking about the hold brought forth sharp conflict in the testimony. There was no error in adopting one of two permissible inferences as to the fire's origin. And, in view of the absence of any warning that FGAN was inflammable or explosive, we would think smoking by longshoremen about the job would not be an abnormal phenomenon.

The evidence showed that this type of fertilizer had been manufactured for about four years at the time of the explosion in Texas City. Petitioners' experts testified to their belief that at least a segment of informed scientific opinion at the time regarded ammonium nitrate as potentially dangerous, especially when combined with carbonaceous material as it was in this fertilizer. One witness had been hired by the War Production Board to conduct tests into explosion and fire hazards of this product. The Board terminated these tests at an intermediate stage, against the recommendation of the laboratory and in the face of the suggestion that further research might point up suspected but unverified dangers. In addition, there was a considerable history over a period of years of unexplained fires and explosions involving such ammonium nitrate. The zeal and skill of government counsel to distinguish each of these fires on its facts appears to exceed that of some of the experts on whose testimony they rely. The Government endeavored to impeach the opinions of petitioners' experts, introduced experts of its own, and sought to show that private persons who manufactured similar fertilizer took no more precautions than did the Government.

In this situation, even the simplest government official could anticipate likelihood of close packing in large masses during sea shipment, with aggravation of any attendant dangers. Where the risk involved is an explosion of a cargo-carrying train or ship, perhaps in a congested rail yard or at a dock, the producer is not

56

entitled as a matter of law to treat industry practice as a conclusive guide to due care. Otherwise, one free disaster would be permitted as to each new product before the sanction of civil liability was thrown on the side of high standards of safety.

It is unnecessary that each of the many findings of negligence by the trial judge survive the "clearly erroneous" test of appellate review. Without passing on the rest of his findings, we find that those as to the duty of further inquiry and negligence in shipment and failure to warn are sufficient to support the judgment.[10] We construe these latter findings not as meaning that each

---

[10] The following are excerpts from the findings of the trial judge: "(g) . . . [Defendant] learned many facts, but did not pursue such investigation far enough to learn all the facts, but negligently stopped short of learning all of the facts. What facts it did learn, however, were sufficient to give Defendant knowledge and to put Defendant on notice, and if not, then upon inquiry that would if pursued, have led to knowledge and notice that such Fertilizer which it decided to and began to manufacture was an inherently dangerous and hazardous material, a dangerous explosive, and a fire hazard. . . . (l) Defendant was negligent in the manner in which it prepared such Fertilizer, including the Fertilizer on the Grandcamp and High Flyer, for shipment. Such Fertilizer was by Defendant, or under it [sic] direction, placed or sacked in bags made from paper or other substances which were easily ignited by contact with fire or by spontaneous combustion or spontaneous ignition of the Fertilizer. Such bags also became torn and ragged in shipping and particles of the bags became mixed with the Fertilizer and rendered same more dangerous and more susceptible to fire and explosion. Such negligence was the proximate cause of such fires and explosions and the injuries of which Plaintiffs complain. . . . (o) Defendant was negligent in delivering or causing to be delivered such Fertilizer, including the Fertilizer on the Grandcamp and High Flyer, so placed in paper bags to the railroad and other carriers over which it was shipped, without informing such carriers that it was dangerous, inflammatory, and explosive in character, and that it was dangerous to persons handling same and to the public. Such negligence was the proximate cause of such fires and explosions and the injuries of which Plaintiffs complain."

omission in the process of bagging, shipping, and failure to warn, if standing alone, would have imposed liability on the Government, but rather that due care is not consistent with this seriatim resolution of every conflict between safety and expediency in favor of the latter. This Court certainly would hold a private corporation liable in this situation, and the statute imposes the same liability upon the Government unless it can bring itself within the Act's exception, to which we now turn.[11]

The Government insists that each act or omission upon which the charge of negligence is predicated—the decisions as to discontinuing the investigation of hazards, bagging at high temperature, use of paper-bagging material, absence of labeling and warning—involved a conscious weighing of expediency against caution and was therefore within the immunity for discretionary acts provided by the Tort Claims Act. It further argues, by way of showing that by such a construction the reservation would not completely swallow the waiver of immunity, that such discretionary decisions are to be distinguished from those made by a truck driver as to the speed at which he will travel so as to keep the latter within the realm of liability.

We do not predicate liability on any decision taken at "Cabinet level" or on any other high-altitude thinking. Of course, it is not a tort for government to govern, and the decision to aid foreign agriculture by making and delivering fertilizer is no actionable wrong. Nor do we

---

[11] 28 U. S. C. § 2680: "The provisions of this chapter and section 1346 (b) of this title shall not apply to—

"(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused. . . ."

find any indication that in these deliberations any decision was made to take a calculated risk of doing what was done, in the way it was done, on the chance that what did happen might not happen. Therefore, we are not deterred by fear that governmental liability in this case would make the discretion of executives and administrators timid and restrained. However, if decisions are being made at Cabinet levels as to the temperature of bagging explosive fertilizers, whether paper is suitable for bagging hot fertilizer, and how the bags should be labeled, perhaps an increased sense of caution and responsibility even at that height would be wholesome. The common sense of this matter is that a policy adopted in the exercise of an immune discretion was carried out carelessly by those in charge of detail. We cannot agree that all the way down the line there is immunity for every balancing of care against cost, of safety against production, of warning against silence.

On the ground that the statutory language is not clear, the Government seeks to support its view by resort to selections from an inconclusive legislative history. We refer in the margin to appropriate excerpts which, in spite of the Court's reliance on them, we believe support our conclusion in this case.[12]

The Government also relies on the body of law developed in the field of municipal liability for torts which deal with discretionary, as opposed to ministerial, acts.

---

[12] See n. 21 of the Court's opinion. We believe that this oft-repeated paragraph appearing in the House Reports shows quite plainly that what was meant is that type of discretion which government agencies exercise in regulating private individuals. The majority chooses instead to fix an amorphous, all-inclusive meaning to the word, and then to delimit the exception not by whether an act was discretionary but by who exercised the discretion. The statute itself contains not the vaguest intimation of such a test which leaves actionable only the misconduct of file clerks and truck drivers.

Whatever the substantiality of this dichotomy, the cases which have interpreted it are in hopeless confusion; some have used "discretionary" and "ministerial" interchangeably with "proprietary" and "governmental," while others have rather uncritically borrowed the same terminology from the law of mandamus.[13] But even cases cited by the Government hold that, although the municipality may not be held for its decision to undertake a project, it is liable for negligent execution or upkeep.[14]

We think that the statutory language, the reliable legislative history, and the common-sense basis of the rule regarding municipalities, all point to a useful and proper distinction preserved by the statute other than that urged by the Government. When an official exerts governmental authority in a manner which legally binds one or many, he is acting in a way in which no private person could. Such activities do and are designed to affect, often deleteriously, the affairs of individuals, but courts have long recognized the public policy that such official shall be controlled solely by the statutory or administrative mandate and not by the added threat of private damage suits. For example, the Attorney General will not be liable for false arrest in circumstances where a private person performing the same act would be liable,[15] and such cases could be multiplied.[16] The official's act

---

[13] See Patterson, Ministerial and Discretionary Official Acts, 20 Mich. L. Rev. 848.

[14] E. g., Keeley v. Portland, 100 Me. 260, 262, 61 A. 180, 181–182; Cumberland v. Turney, 177 Md. 297, 311, 9 A. 2d 561, 567; Gallagher v. Tipton, 133 Mo. App. 557, 113 S. W. 674.

[15] Gregoire v. Biddle, 177 F. 2d 579.

[16] Spalding v. Vilas, 161 U. S. 483 (Postmaster General); Wilkes v. Dinsman, 7 How. 89 (officer of Marine Corps); Otis v. Watkins, 9 Cranch 339 (Deputy Collector of Customs); Yaselli v. Goff, 12 F. 2d 396, aff'd 275 U. S. 503 (Special Assistant to the Attorney General). The overwhelming weight of authority in the states is to the same effect. See 42 Am. Jur. § 257.

might inflict just as great an injury and might be just as wrong as that of the private person, but the official is not answerable. The exception clause of the Tort Claims Act protects the public treasury where the common law would protect the purse of the acting public official.

But many acts of government officials deal only with the housekeeping side of federal activities. The Government, as landowner, as manufacturer, as shipper, as warehouseman, as shipowner and operator, is carrying on activities indistinguishable from those performed by private persons. In this area, there is no good reason to stretch the legislative text to immunize the Government or its officers from responsibility for their acts, if done without appropriate care for the safety of others. Many official decisions even in this area may involve a nice balancing of various considerations, but this is the same kind of balancing which citizens do at their peril and we think it is not within the exception of the statute.

The Government's negligence here was not in policy decisions of a regulatory or governmental nature, but involved actions akin to those of a private manufacturer, contractor, or shipper. Reading the discretionary exception as we do, in a way both workable and faithful to legislative intent, we would hold that the Government was liable under these circumstances. Surely a statute so long debated was meant to embrace more than traffic accidents. If not, the ancient and discredited doctrine that "The King can do no wrong" has not been uprooted; it has merely been amended to read, "The King can do only little wrongs."