Alfred J. RAPPENECKER, Albert Minichello, Darryl V. Kastl, Frank Conway and Raymond Paul Friedler, Jr., Plaintiffs,

v.

UNITED STATES of America, Defendant.

Carol A. SCHMIDT, As Administratrix of the Estate of Earl C. Gilbert, Plaintiff,

v.

UNITED STATES of America, Defendant.

Juan P. SANCHEZ and Wilbert N. Bock, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Francis PASTRANO, Plaintiff,

v.

UNITED STATES of America, Defendant.

Nos. C–76–0298–WWS, C–76–0422–WWS, C–77–0565–WWS and C–77–0939–WWS.

United States District Court, N. D. California.

March 10, 1981.

See also, 509 F.Supp. 1024.

Martin J. Jarvis, Jarvis, Miller, Brodsky & Baskin, Inc., San Francisco, Cal., for plaintiffs.

G. William Hunter, U.S.Atty., Philip A. Berns, Warren A. Schneider, Attys., Torts Branch, Civil Division, Dept. of Justice, San Francisco, Cal., John Perruzzi, Defense Mapping Agency, William E. Gwatkin, III, Admiralty & Shipping Section, U. S. Dept. of Justice, Washington, D. C., for defendant.

### MEMORANDUM OF OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

WILLIAM W. SCHWARZER, District Judge.

These consolidated actions arise out of the seizure of the SS MAYAGUEZ on May 12, 1975 by Cambodian forces in the vicinity of the Poulo Wai Islands off the Cambodian coast. At the time of the seizure, the MAYAGUEZ was proceeding on a course plotted in accordance with the Sailing Directions, a volume published by the United States government. The factual background is set forth in this Court's earlier opinion of July 8, 1980, 509 F.Supp. 1024, which is incorporated herein by reference. In that opinion, it was held that the plaintiffs could not maintain an action for damages based on the alleged negligence of the government in connection with the military operations and the attempted rescue of the crew.

In the present action, the issue before the Court is whether the government can be held liable for failure to disseminate a warning to mariners concerning the possibility of attack or seizure by forces of the newly-established government of Cambodia. I find that the State Department had been advised on May 4, 1975 by the American Embassy in Korea that there had been an attempted seizure of a Korean vessel, the MASAN, by what appeared to be Cambodian military forces. On May 5, the State Department received a report of a shelling in the same general area by a Communist vessel, and, on May 7, the United States intelligence community learned of the seizure of a Panamanian vessel, again by Cambodian forces. This vessel was released about 36 hours after the capture.

Plaintiffs contend that the government, in view of the information it possessed, was negligent in not issuing a warning to mariners.

Two kinds of warnings issued by the government are relevant to these cases. The first kind consists of the so-called long-range radio navigational warnings issued by the Defense Mapping Agency Hydrographic Center. The warnings which are broadcast in the Pacific Ocean are called HYDROPACS, and those in the Atlantic Ocean HYDROLANTS. They are intended primarily to provide vessels at sea with navigational safety information such as changes or malfunctions in major navigational aids, new depth information, naval operations, search and rescue operations and the like. These radio warnings are later included in the

printed Notices to Mariners published weekly.

The second kind of warnings are so-called Special Warnings used to disseminate political and military information which may affect United States shipping. These are broadcast along with HYDROPACS and HYDROLANTS and also are later published.

Between 1948 and the first of May 1975, only 44 Special Warnings had been issued. Of these, six dealt with the Middle East hostilities in 1948, five with actions by the Chinese government in 1949 and 1950, and five with activities in the vicinity of Cuba in 1962.

Primary responsibility for issuing Special Warnings, due to their political sensitivity and other ramifications discussed later, rests with the Office of Maritime Affairs of the State Department. Other agencies may recommend or request such warnings but the State Department has the responsibility for clearing them before they are issued.

Although normally the long-range radio navigational warnings are limited to routine navigational safety information, the record shows that there have been at least two occasions on which political-military information was included in those kinds of messages. The first occasion involved the issuance in 1962 of warnings primarily for the protection of small boats which might be operating within waters claimed by Cuba as its territorial waters. The other occasion was when HYDROLANTS were used to transmit proclamations issued by foreign nations during the 1973 Middle East war warning mariners of actions taken by the various belligerents which might affect the vessels' navigation.

Neither hydrographic warnings nor Special Warnings are necessarily or invariably issued when an event having a possible impact on the safety of ships at sea either occurs or may be expected to occur. For example, no such warnings were issued with respect to pirate activities in the area of the Philippines during the 1960's or 1970's although those had a direct effect on shipping safety in that area. These hydrographic broadcasts do not purport and are not held out to be a complete report of all matters occurring in the world that may be relevant to safe navigation or passage. In fact, they do not reflect more than a small fraction of the information received by the Defense Mapping Agency.

This Court has jurisdiction of these actions under the Suits in Admiralty Act (hereinafter "S.I.A.A."), 46 U.S.C. Section 742, under which the Court has jurisdiction over cases against the Government where, if a private person were involved, a proceeding in admiralty could be maintained.

The first question concerns the nature of the government's duty. It is not and could not be claimed in this case that the government has a statutory duty to issue warnings to mariners. There is no such statutory obligation. Even the Safety of Life at Sea Treaty, to which reference is made by plaintiffs, cannot be read to impose such a clear and inflexible duty on the government. Thus, if liability is to be imposed on the government, it can only be imposed if a private party would be liable in these circumstances. *See Zabala Clemente v. United States*, 567 F.2d 1140, 1144 (1st Cir.) *cert. denied*, 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978).

In substance, plaintiffs rely on the principle articulated in *Indian Towing Company v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955). It should be observed that the *Indian Towing* case arose under the Federal Tort Claims Act, not the S.I.A.A. However, the *Indian Towing* principle has been applied under admiralty law as well. *See, e. g., United States v. Gavagan*, 280 F.2d 319 (5th Cir. 1960), *cert. denied*, 364 U.S. 933, 81 S.Ct. 379, 5 L.Ed.2d 365 (1961); *Frank v. United States*, 250 F.2d 178 (3d Cir. 1957), *cert. denied*, 356 U.S. 962, 78 S.Ct. 1000, 2 L.Ed.2d 1069 (1958), and *United States v. Devane*, 306 F.2d 182 (5th Cir. 1962). Furthermore, the 1960 amendment to the S.I.A.A. would incorporate that concept since an *Indian Towing* type case would now be brought under the S.I.A.A.

■ It seems to the Court, therefore, that the principle stated in *Indian Towing*

supplies the substantive law applicable to this case essential to any recovery by the plaintiffs, as set forth in *United Scottish Ins. Co. v. United States*, 614 F.2d 188, 194 (9th Cir. 1979). Although *United Scottish Insurance* is not controlling, it articulates the law in the Ninth Circuit that in the absence of a statutory duty, one must find a source of applicable substantive law in order for a plaintiff to recover either under the Federal Tort Claims Act or, by analogy, under the S.I.A.A.

In the usual case, the courts look to state law applicable to the particular incident. But this being an admiralty case, one must look to admiralty law. The Court concludes that the good Samaritan principle articulated in the *Indian Towing* case applies here. Strictly speaking, the *Indian Towing* case is only an interpretation of the discretionary function exemption, but it rests on the assumption that the good Samaritan rule applies. The cases previously cited establish that this principle would apply in the instant situation.

Under the good Samaritan principle, liability may be found on any one of three grounds. The first of these would be that the defendant's conduct actually increased the risk of harm to the plaintiff. That rationale is not applicable here. The second would be that there was a prior independent duty which existed and is binding on the defendant; as previously stated no such claim is made here. Finally, plaintiffs could show that the injury resulted to them from their reliance on the defendant; that is the ground on which the plaintiffs here rely.

In order to sustain liability on that ground, the plaintiffs have to establish three elements: first, that the government undertook to provide a particular service; second, that the government thereby engendered reliance on it; and third, that the government failed to use due care in carrying out that service. The Court will examine each of those three elements separately.

First, what did the government undertake? It is quite true that the government has, over the years, issued navigation-al safety warnings, as well as Special Warnings, of a political and military nature, but it has never held itself out as undertaking an obligation to warn mariners of all dangers at sea. The government's regulations do not contain any such representation nor do any publications suggest it. There is no evidence to indicate that the government is holding itself out as undertaking to warn mariners of all dangers at sea.

This case is fundamentally different from the *Indian Towing* type of case. *See also Thompson v. United States*, 592 F.2d 1104, 1110 (9th Cir. 1979). When the government undertakes, for example, to provide a lighthouse, that service necessarily becomes fixed and certain. The purpose of a lighthouse is to provide a fixed navigational reference to mark a particular location by providing a contrast between light and dark. It is similar to the service provided by a chart. Normally, a chart purports to be a complete portrayal of the area; where no markings appear this may be taken to reflect the absence of geographic features.

Hydeographic safety warnings, however, do no more than undertake to convey to mariners selected information if, as, and when the government receives it and considers it to be relevant to navigational safety. The government has never undertaken to provide mariners with advance warning of every possible hazard to safety or even every possible hazard that may come to the attention of some government agent or employee. As a matter of reason and common sense, the government could not possibly undertake such an obligation, and there is no evidence that mariners have any different understanding.

With particular reference to political-military hazards, such as are here involved, the government has not held itself out to give such warnings at all as part of its long-range radio navigational service. Those warnings are described in a Pilot Chart, which was published by the United States and distributed generally to mariners; it lists various categories of warning, not including political and military warnings.

When the government has in fact given warnings concerning political and military

**1022**

matters, those warnings, with two exceptions, have been in the form of Special Warnings. But since only 44 Special Warnings were issued between 1948 and the first of May 1975, of which 16 were connected with only three events, it is obvious that those warnings are a rare occurrence. In view of the unsettled state of the world, and the number and variety of events constantly occurring, or threatened, that affect or may affect shipping, the issuance of those few warnings cannot be interpreted as an undertaking to provide a complete warning service with respect to all possible dangers of that nature.

This leads to the second element: did the government engender reliance on the absence of a warning? What has been said with reference to the first element concerning the government's undertaking also largely disposes of this point. Once the government establishes a lighthouse, it invites mariners to rely on the presence of that navigational aid at that fixed and known location. If that aid ceases to function, or to function properly, navigational errors can be expected to result. This distinction is also illustrated by the decision in *De Bardeleben Marine Corp. v. United States*, 451 F.2d 140 (5th Cir. 1971), in which a government chart on board a vessel did not reflect a submerged pipeline laid in 1962, although the legend on the chart stated that it had been corrected through July 1963. As the court there said, the charts are published with the knowledge that they will be relied on by mariners as an accurate portrayal of the waters covered.

Plaintiffs' contention here, in substance, is that mariners rely on these warnings. The evidence shows that the MAYAGUEZ' captain complied with the warning advising vessels to stay more than 25 miles off the coast of Viet Nam, and that he would have observed a similar warning, had it been issued, respecting the Cambodian coast. Moreover, plaintiffs say the captain, in following the course recommended by the government in the Sailing Directions, was relying on the absence of any such warning.

It is clear that the Sailing Directions are nothing more than a service advising mariners, for their convenience, of recommended courses, taking into account currently available information about navigational features. They do not purport to be a representation of the absence of undisclosed hazards and carry with them no express or implied obligation to advise of any possible hazards which might arise subsequently, and there is no evidence that they have engendered that kind of reliance.

The fact that a reasonable mariner would heed a warning, as the captain testified, is not evidence that he relied on the absence of a warning. Reliance in the good Samaritan sense discussed in *Indian Towing* means more than adherence to a previously and independently determined course of action without specific reference to government action. It requires at least proof that a party acted or refrained from acting with conscious reference to the action or inaction of others.

This leads to the third element: did the government fail to use due care when it failed to broadcast a warning concerning the previous seizures? There are two aspects of this element. The first is, is there evidence of lack of due care on the part of the government? As already discussed, the subject matter of the possible warning was military-political. In the ordinary course, that would be a subject for a Special Warning, if any were issued. If the information about the earlier seizures, attacks or detentions had been received by the Defense Mapping Agency, the testimony shows clearly that agency would in any case have forwarded it to the State Department for analysis and clearance.

There is no evidence that any of the information ever reached the Defense Mapping Agency prior to the MAYAGUEZ seizure. The evidence shows only that the State Department Operations Center received some information about the aborted seizure of a South Korean vessel and about the shelling of a vessel off Cambodia a few days before the seizure of the MAYAGUEZ. In addition, some intelligence agency or agencies of the government learned of the brief detention of the Panamanian vessel, but there is no evidence that either the Defense Mapping Agency or the State De-

partment Office of Maritime Affairs received this information.

The failure by the responsible agencies of the government to issue a warning cannot be found to be negligent in these circumstances unless the information is imputed to them as a matter of law. The fact that somebody in the government, large as it is, acquires some information is not sufficient to charge other government personnel with having that same information. In the absence of a legal duty on the part of government agencies to communicate information in their possession to other agencies, the information cannot be imputed to them. Plaintiffs have offered no basis for finding such a duty on the part of others in the government, and the Court is aware of none.

However, even if one could find negligence, the second aspect of the due care element is whether that negligence would be actionable. Even if one were to assume that the Defense Mapping Agency or the Office of Maritime Affairs had information, actual or constructive, on the basis of which they could have issued a warning, the decision whether to issue a warning, in the Court's view, is clearly a discretionary function.

In its prior opinion, the Court determined that the discretionary function exemption under the Federal Tort Claims Act, 28 U.S.C. § 2680, that is, the exception for liability based on negligent performance or failure to perform a discretionary function, applies to actions under the S.I.A.A.

In its investigation of the MAYAGUEZ incident, the General Accounting Office report introduced by plaintiffs into evidence as Exhibit 1 found:

> The decision to issue a warning to U.S. mariners concerning political-military hazards at sea is to a large extent a matter of judgment on the part of responsible officials in the State Department and in Naval Operations.

The report also finds that if the responsible officials had known of the prior incidents, some kind of warning would have been issued, although the testimony at trial of the responsible officer then in charge of the Office of Maritime Affairs leaves that matter somewhat open to doubt. In any event, the conjecture, ex post facto, by the General Accounting Office does not in any way alter the fact that the decision whether to issue a warning was a discretionary matter.

Plaintiffs argue by analogy to *Indian Towing* that once the government makes the decision to institute a system of warnings, it must operate that system with due care, i. e., the discretion has been exhausted once the decision to establish the system has been made. It seems obvious to the Court, however, that the issuing of political-military warnings is not a routine mechanical function in any sense analogous to operating a lighthouse or issuing charts. The record shows that the decision whether to issue a warning, and if so, what to say in that warning, implicates political, military, and foreign policy issues, as well as the matter of commercial impact on those receiving the warning, and the entire question of credibility of the United States government in issuing official warnings. All of these, and no doubt other implications, have to be considered by the responsible officials in determining whether or not to issue a warning.

In *Blessing v. United States*, 447 F.Supp. 1160, 1170 (E.D.Pa.1978), the court analyzed at length the discretionary function exemption and the cases which had interpreted it. The court determined that the discretionary function exception is founded on a policy of preventing tort actions from becoming a vehicle for judicial interference with decision-making that is properly exercised by other branches of the government and of protecting the government from liability that would seriously handicap efficient government operations. The present case falls squarely within that reasoning. *See also Dalehite v. United States*, 346 U.S. 15, 34–36, 73 S.Ct. 956, 967–968, 97 L.Ed. 1427 (1953).

The Court concludes that the plaintiffs have failed to sustain their contention that the good Samaritan doctrine should apply: there was no undertaking by the government, there was no reliance by the vessel, there was no negligence by the government,

and the discretionary function exception applies. In the absence of any other duty on the part of the government, therefore, plaintiffs have failed to sustain their burden of establishing their claim. In view of the disposition of these matters, it is not necessary to reach other issues, such as the matter of proximate cause.

This opinion shall constitute findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.