**Mary J. TURNER, to her own Use and Benefit and to the Use of Employers Fire Insurance Company, Plaintiff,**

**v.**

**UNITED STATES of America et al., Defendants.**

Civ. A. No. 77–0999.

United States District Court, District of Columbia.

July 25, 1979.

Edward S. Horowitz, College Park, Md., J. Edward Martin, Jr., Baltimore, Md., Thomas Hogan, Rockville, Md., for plaintiff.

Robert M. Werdig, Jr., Asst. U. S. Atty., Washington, D. C., for defendants.

## MEMORANDUM OPINION

GESELL, District Judge.

This matter came originally before the Court on defendants' motion for summary judgment. When the Court indicated a preference for having a full record before it, the parties agreed to submit the issue of liability to the Court on depositions, responses to interrogatories and stipulations. That entire record has now been thoroughly considered and the Court has had the benefit of the parties' briefs.

Plaintiff was beaten severely and robbed while performing her duties on the evening of September 30, 1975. Alleging negligence she sues for damages under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–80. There are no material facts in dispute. Plaintiff was a regular employee in the South Building of the Department of Agriculture where she worked as a lithograph operator from 8:30 a. m. to 5:00 p. m. At approximately 5:00 p. m. she assumed her duties as supervisor of a cleaning force working in the same building. She was employed as supervisor by the Springfield Building Maintenance Company, an independent contractor to the General Services Administration.

Plaintiff was injured about 6:00 p. m. while working on the second floor of the South Building. The circumstances of her injury are as follows. After reporting for work as an employee of Springfield and making certain preliminary assignments of the crew under her supervision, she proceeded to the second floor where she had agreed to assist one of the crew assigned to the cleaning maintenance operation on that floor. Plaintiff undertook these duties because several employees had failed to show up for work and the operation was shorthanded. She proceeded cautiously as she was about to enter a small unlighted office. There had been thefts from time to time in the building and on two prior occasions she had encountered unauthorized persons after hours. At approximately 6:00 p. m. she kicked the office door open as she was about to enter. She saw a man behind the desk in the room and screamed. The man followed her into the hall, dragged her back into the room, robbed her and beat her with a crowbar or chisel. Her assailant was subsequently identified, prosecuted and convicted. He has refused in spite of the earnest efforts of counsel on both sides to permit his deposition to be taken and persists in his testimony given at the criminal trial that he was not in the Agriculture

building.* Thus there is no proof or available evidence to indicate how or when plaintiff's assailant entered the building.

The South Building is a large structure occupying the area between 12th and 14th Streets, S.W. and Independence Avenue and C Street, S.W. It has a number of wings and many separate entrances. The General Services Administration ("GSA"), which is responsible for building operations, provides limited guard service. The building is open to the general public during regular office hours from 8:00 a. m. until 5:30 p. m. During this period individuals can come and go without identification of any kind and there are normally no special security arrangements in effect. From 6:00 p. m. to 10:00 p. m., the building is used for evening classes. Two Federal Protective Officers come on duty at 4:00 p. m., and after performing a general inspection of the building and other chores, they commence to secure the building at 5:30 p. m. The officers lower the flags and lock the various doors except for two, a process which takes about half an hour. At approximately 6:00 p. m. each officer is stationed at one of the two entrances that remain open, and access or departure is thereafter governed by a sign-in/sign-out procedure. The incident in question here occurred before the officers had completed their duties of securing the doors and initiating the evening sign-in/sign-out procedure.

Plaintiff's theory of negligence rests on the claim that the attack on her was foreseeable because a number of criminal incidents had previously occurred in the building; and that it was negligent to have left the evening entrances unguarded between 5:30 and 6:00, to have reduced by one the number of guards and to have lowered the lighting in the building for energy conservation reasons. The United States contends that it breached no duty toward the plaintiff; that its decisions with respect to the appropriate number of security guards, the procedures they would follow, and the

extent of evening lighting were discretionary matters for which it cannot be sued under the Federal Tort Claims Act; and that in any event the attack could not have been predicted with reasonable probability based on the building's past experience, and therefore that no liability can be imposed.

■ For purposes of tort liability, the degree of security which the Government must provide in its building with respect to non-structural dangers raises different considerations than were addressed by the Court of Appeals in *Kline v. 1500 Mass. Ave. Apt. Corp.,* 141 U.S.App.D.C. 370, 439 F.2d 477 (1970), where a landlord-tenant relationship created a variety of implied contract, *see Cook v. Safeway Stores, Inc.,* 354 A.2d 507, 510 (D.C.App.1976), or by the Supreme Court in *Lillie v. Thompson,* 332 U.S. 459, 68 S.Ct. 140, 92 L.Ed. 73 (1947), where an employer-employee relationship was involved. *See also Swanner v. United States,* 309 F.Supp. 1183, 1187–88 (M.D.Ala. 1970). In the absence of any like relationship, there is no implied guarantee of safety against the occurrence of violence in a government building. By their very nature, such buildings must, insofar as possible, remain accessible and open to the steady flow of dissimilar citizens who, occasionally under stress or in anger, seek information or assistance. This is a reality which courts must recognize. It would be contrary to the public interest to evolve a theory of liability which placed upon the Government a continuing duty stringently to safeguard access to its various executive departments, at least in the absence of an imminent probability of harm.

■ Plaintiff bears the burden of showing negligence. Under the peculiar circumstances of this case, plaintiff could not show at trial the circumstances under which her assailant obtained entry. The attacker was apprehended and convicted, but he has steadfastly refused to give the parties any information as to how or when he obtained entrance to the building. It is

---

\* For the benefit of the parties, the Court delayed this case for a substantial period in the hope that, following his unsuccessful appeal, the as-

sailant would be willing to testify. He has nonetheless refused to do so and remains incarcerated at Lorton for his crime.

320

entirely possible that he entered the building in normal fashion during public hours. Moreover, plaintiff cannot show that in this instance the Government had actual or constructive knowledge that there was any particular person in the building who presented an actual danger to its occupants. There had been no threat or forewarning of any kind.

■ Given the prevalence of crime in the District of Columbia, it is, of course, always "foreseeable" that harm could come to an occupant of a government building. Foreseeability, however, cannot be enough to impose tort liability on the Government in this kind of case. *See Goldberg v. Housing Authority of Newark,* 38 N.J. 578, 186 A.2d 291, 293 (1962). A duty to protect those entering a government building from violent assault can exist, if at all, only where there is actual or constructive knowledge of an imminent probability of that particular type of harm. Circumstances can be imagined which would create such a duty with respect to those legitimately in the building after hours but circumstances of that sort did not exist here. Like all government buildings, this building had seen instances of petty theft, vandalism and occasional violence. During the several months immediately preceding the assault on plaintiff, however, most of these incidents had taken place during office hours, and when they were violent had involved disputes between employees. Nothing had occurred to warrant special precautions against the type of incident which caused injury to plaintiff. *See Cook v. Safeway Stores, Inc., supra,* 354 A.2d at 508–10; *Dwyer v. Erie Investment Co.,* 138 N.J.Super. 93, 350 A.2d 268 (1975); *Nigido v. First National Bank of Baltimore,* 264 Md. 702, 288 A.2d 127 (1972). Barring such an event or events, the United States was under no special duty to provide plaintiff any particular protection against violence.

No statute or regulation requires that such protection be given. 40 U.S.C. § 318 (1976). The responsibility for determining and providing protective service in a GSA-maintained building such as the Agriculture building is delegated to GSA, *see* 40 U.S.C. § 318a (1976), and defined in the Federal Property Management Regulations, 41 C.F.R. § 101–20.5. The regulations provide that "GSA will furnish as normal protection not less than the degree of protection provided by commercial building operators of similar space for normal risk occupants, as determined by GSA." 41 C.F.R. § 101–20.-501. The regulations also set forth the criteria to be used by the agency in making the determination:

Determination of the level of normal protective service will be made by GSA on a case-by-case basis and will consider the facility's location; size and configuration; history of criminal or disruptive incidents in the surrounding neighborhood not primarily directed toward the occupant agency's mission; extent of exterior lighting; presence of physical barriers; and such other factors as may be deemed pertinent.

41 C.F.R. § 101–20.502.

■ There is no proof that this reasonable standard was violated in this instance. By establishing security at designated entrances after business hours, defendant was adhering to a reasonable standard of care consistent with community standards and there is no showing that a higher standard was required by any facts known to defendant. There is, moreover, no proof that even if a higher standard of protective service had been established the failure to follow a higher standard on the facts of this case could be said to be a proximate cause of the injury. Finally, the Government's decision to maintain only two guards and to lower the lights due to the energy crisis were clearly discretionary acts. *See Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953); *United States v. Faneca,* 332 F.2d 872, 874–75 (5th Cir. 1964), *cert. denied,* 380 U.S. 971, 85 S.Ct. 1327, 14 L.Ed.2d 268 (1965); *Monarch Insurance Co. v. District of Columbia,* 353 F.Supp. 1249, 1256–59 (D.D.C.1973), *aff'd mem.,* 162 U.S. App.D.C. 96, 497 F.2d 684, *cert. denied,* 419 U.S. 1021, 95 S.Ct. 497, 42 L.Ed.2d 295 (1974); *Taxay v. United States,* 345 F.Supp.

1284, 1285–86 (D.D.C.1972), *aff'd mem.*, 159 U.S.App.D.C. 343, 487 F.2d 1214 (1973); 28 U.S.C. § 2680(a) (1976).

Plaintiff has failed to meet her burden of proof. No negligence on the part of defendants was established. The complaint must therefore be dismissed. The Clerk of Court shall enter judgment for defendants.

SO ORDERED.