**Jane DOE, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 81–1435–Civ–JLK.**

United States District Court, S. D. Florida.

Feb. 11, 1982.

---

246

Ana H. Barnett, Asst. U. S. Atty., Miami, Fla., for plaintiff.

Rosalyn L. Cohen, Miami, Fla., for defendant.

## ORDER SETTING FORTH FINDINGS OF FACT AND CONCLUSIONS OF LAW

JAMES LAWRENCE KING, District Judge.

### INTRODUCTION

On Sunday, June 24, 1979, plaintiff Jane Doe was forcibly raped in a United States Post Office located at 16400 West Dixie Highway, North Miami Beach, Florida. Jane Doe's assailant was subsequently apprehended, convicted, and sent to jail for his crime.

As a consequence of her rape, Jane Doe brought suit against the Government[1] claiming that it was negligent in failing to adequately protect her, as a postal patron, from violent criminal acts.

The Court conducted a non-jury trial on this matter on January 25, 1982. The trial lasted one full day, during which time the Court heard the arguments and evidence presented by counsel. Based on the trial, and the record as a whole, the Court hereby finds that the Government conducted itself in a negligent manner and consequently is liable to the plaintiff in the amount of seventy thousand dollars ($70,000.00).

This opinion sets forth findings of fact and conclusions of law. It is divided into four sections: The first discusses jurisdiction, the second presents the facts, the third examines the legal issues, with emphasis on the question of foreseeability, and the fourth deals with damages.

### I. JURISDICTION

■ Suit was brought by plaintiff pursuant to the Federal Tort Claims Act and 28 U.S.C. § 1346(b). The Court believes that Section 1346 provides a clear basis for federal jurisdiction. In a suit brought pursuant to the Federal Tort Claims Act, moreover, the United States may be held liable as a party-defendant to the same extent and in the same manner as any private party, 28 U.S.C. § 2674, but is immune from interest prior to judgment and from punitive damages. *Id.*

### II. FACTS

A.) *The Rape on June 24, 1979*

At the time of the rape, Jane Doe was 24 years old. She resided in North Miami Beach, was employed by the Dade County Manager's Office, and held degrees from Broward Community College and Florida Atlantic University.

On the day of the rape, Jane Doe returned home from Catholic Mass at approximately 7:30 p. m. She addressed some invitations which she planned to mail that evening. Soon thereafter, the plaintiff rode her bicycle to the nearby 163rd Street shopping center to purchase stamps. She then proceeded to the North Miami Beach Post Office[2] with the invitations to ensure that they would go out in the next morning's mail. She arrived at the post office at approximately 8:15 p. m.[3] When she entered the post office lobby and approached the desk towards the rear of the lobby, another postal patron, an adult male, was leaving the lobby.[4]

Jane Doe saw another adult male open the door and peer into the lobby area. That man, a stranger, then entered, cornered the plaintiff, and brutally raped her. No one else entered the post office during the entire time Jane Doe was in the post office.

Jane Doe subsequently escaped from her assailant and, although battered and wearing shredded clothing, rode home. She reported the rape to the police and then went to the Rape Treatment Center at Jackson Memorial Hospital where she was treated and released.

---

1. The Complaint was filed on July 8, 1981.

2. The plaintiff apparently was aware of the existence of this post office because it was located not too far from her home.

3. Jane Doe testified that she arrived at dusk, but that car drivers had not yet turned on the headlights of their cars.

4. The service area was closed at this time.

B.) *The Structure and Pertinent Operational Aspects of the North Miami Beach Post Office*

The North Miami Beach Post Office, leased by the Government from private individuals, is a one story concrete block and stucco structure located on the corner of two streets. It is divided into two main areas, a service section and a lobby which houses rental lockboxes. These areas, divided by two glass doors, both border on the street.

The lobby area is lit by overhead lights.[5] Its windows begin approximately six feet from the ground. One pair of double doors opens onto the sidewalk, providing the only access to and from the street when the service area is closed; to see inside the lobby from the street, one must open these doors and peer inside.

The lobby itself is rectangular. The lockboxes stand on the wall directly across from the double doors to the street as well as on the adjacent wall, directly opposite from the wall containing the doors to the service area.[6] The desk at which Jane Doe was preparing to mail her invitations when she was raped is located near the end of the lobby, against the wall containing the double doors to the street.

In the months prior to and including the date of the rape, the service area was open until 5 PM on weekdays, and 12 noon on Saturdays. The rental lockbox area was open to the public on a 24 hour a day basis.

On March 2nd and 3rd, 1979, the post office conducted a survey as a result of several lockbox break-ins to determine whether the Postal Service should continue leaving the lockbox area open 24 hours a day. Based on the survey, a post office administrator recommended that the hours be shortened to 5:00 a. m. to 8:00 p. m. on Monday through Saturday and to 8:30 a. m.

to 1:00 p. m. on Sunday. The post office administrator received permission to implement the recommended changes at some time prior to June 24, 1979. The proposed changes, which would have closed the lobby at the time of the rape, were apparently instituted the day after the rape occurred.[7]

## III. THE LEGAL ISSUES

There are two major issues in this case: whether the defendant may be held liable under the Federal Tort Claims Act; and, if so, whether it was negligent in leaving the lobby area open to the public at large on a 24 hour a day basis without any protection afforded to postal patrons.

A.) *Liability Under the Federal Tort Claims Act*

■ The defendant contended that the discretionary function exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(a), bars this action. That section provides, in pertinent part, that the Act does not apply to:

"any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

28 U.S.C. § 2680(a).

The current rule, derived from the basic authority of *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), is set forth in *Barton v. United States*, 609 F.2d 977 (10th Cir. 1979):

[I]f a government official in performing his statutory duties must act without re-

---

5. The description of the lobby area pertains to the lobby area as it was on June 24, 1979.

6. When walking into the lobby area, the doors to the service area are on the left and the lockboxes directly ahead and to the right.

7. Testimony by Mr. Norman Delong, Post Office Director of Customer Services, indicated that the change in hours was not in response to the rape, but occurred in the normal course of business. There was conflicting testimony, however, as to the exact day the new hours took effect.

liance upon a fixed or readily ascertainable standard, the decision he makes is discretionary and within the exception of the Tort Claims Act. Conversely, if there is a standard by which his action is measured, it is not within the exception. The statute provides that if the act of the official is discretionary, it is not actionable even though the discretion is abused.

609 F.2d at 979.[8]

The plaintiff cites several office regulations[9] which she contends set forth readily ascertainable standards for postal decisions about the permissible minimum level of protection afforded to postal patrons.[10] She argues that pursuant to *Barton*, such decisions are non-discretionary and outside of the statutory exception.

The Court agrees with the plaintiff. The regulations provide sufficiently ascertainable criteria concerning decisions about the minimum level of protection and security afforded to postal customers. Moreover, even without the existence of the specific post office regulations cited, the general negligence standard applicable to business premises open to the public is sufficiently articulable and ascertainable so as to provide a standard upon which safety decision may be based.

### B.) *Negligence*

■ Under the Federal Tort Claims Act, a federal court must look to the law of the place where the act or omission occurred in determining whether liability exists. 28 U.S.C. § 1346(b). Therefore, in the present suit for negligence, the law of the State of Florida applies. Under Florida Law:

> "negligence is the failure to use that degree of care, diligence and skill that is one's legal duty to use in order to protect another person from injury. The degree of care required is ordinary and reasonable care according to a particular set of circumstances."

*Mascheck, Inc. v. Mausner*, 264 So.2d 859 (Fla. 3rd DCA 1972); *see also Johnson v. Aetna Cas. & Sur. Co.*, 339 F.Supp. 1178 (M.D.Fla.1972).

■ In determining whether the Government was negligent, the Court must determine whether the Government owed a duty to the plaintiff, whether the Government breached that duty, and whether Jane Doe's injuries were proximately caused by such a breach. *Simon v. Tampa Elec. Co.*, 202 So.2d 209 (Fla. 2d DCA 1967). The imposition of a duty is contingent upon the foreseeability of the type of act to which the plaintiff fell victim. *Firestone v. Lippincott*, 383 So.2d 1181, 1182 (Fla. 5th DCA 1980); *Vining v. Avis Rent-a-Car Systems, Inc.*, 354 So.2d 54 (Fla.1977) on remand 355 So.2d 226 (Fla.App.1978).

### *Foreseeability*

■ A post office customer should be viewed as a "business invitee"[11] for the

**8.** *See Also Reminga v. United States*, 631 F.2d 449, 456 (6th Cir. 1980), which followed *Barton v. U. S., supra.*

**9.** One regulation provides that:
"No job shall be considered efficiently completed unless the employee has followed every reasonable precaution and safety rule to protect himself, his fellow employees and the public."
Supervisor's Safety Handbook, Personnel Series P–13 issued February 28, 1974.
A second regulation states that:
Normally, separate lockbox lobbies should remain open when someone is on duty in the postal unit. At the postmaster's discretion, lobbies may remain open when no one is on duty to allow customer access to lockboxes and self-service equipment, provided custom-

er safety, security provisions and police protection are deemed adequate.
Postal Operations Manual § 221–23 (1979).

**10.** Plaintiff contends that violation of these provisions constitutes negligence *per se*. The Court does not go so far as to make a finding of negligence *per se* under the circumstances of this case. The regulations cited, however, are of a kind that generally do not lend themselves to a finding of negligence *per se*. In comparison, *National Hotel, Inc. v. Estate of G. and H. Miller*, 405 So.2d 218 (Fla. 3rd DCA 1981), which involved a regulation requiring public swimming pools to have a minimum water depth in diving areas.

**11.** *See* Prosser, *The Law of Torts*, 385 (4th Ed. 1971), for a definition of "invitee."

purpose of determining what duty, if any, was owed by the defendant to plaintiff.

■ In this context, the duty of care owed to a business invitee is "protection from those crimes which may be shown to be reasonably foreseeable", *Fernandez v. Miami Jai-Alai, Inc.*, 386 So.2d 4 (Fla. 3rd DCA 1980). "Where it is foreseeable that the plaintiff will suffer the injury sued on, the supplier of the service has a legal duty to use reasonable care to avoid unreasonable risks to that plaintiff in performance of his service." *Navajo Circle, Inc. v. Development Concepts*, 373 So.2d 689, 691 (Fla. 2d DCA 1979).

■ Defendant contends that criminal acts are foreseeable only if the defendant had "actual or constructive knowledge of prior, similar criminal acts committed upon invitees." *Relyea v. State*, 385 So.2d 1378, 1385 (Fla. 4th DCA 1980). This Court considers that formulation to be too narrow. As phrased, that formulation excludes consideration of the physical layout of the building, crime in the area, the safeguards afforded to patrons, and other pertinent factors that bear on the issue of foreseeability. In this case, consideration of these additional factors leads the Court to conclude that the type of criminal acts to which the plaintiff fell prey were foreseeable.

In addition, the case relied on by defendant, *Relyea v. State, supra*,[12] is inapposite to the case at bar. *Relyea* involved the kidnap-murders of two Florida Atlantic University coeds as they exited from an evening class. The Court held that decisions concerning the type of security the University provided were discretionary and consequently exempt from suit under the exception allowed for discretionary decisions by state actors. The *Relyea* Court also considered the question of whether criminal acts should have been anticipated in the area of the assault or on the campus generally. In so doing, it noted that no prior serious criminal acts had been reported against a person anywhere on campus since the school opened in 1963. The Court relied on this fact in concluding that the violent crime was not foreseeable. 385 So.2d at 1382.[13] In comparison with the case at bar, the occurrence of violent criminal acts on a

---

**12.** Defendant further relied on the case of *Turner v. U. S.*, 473 F.Supp. 317, 320 (D.D.C. 1979). The *Turner* Court stated that a

"duty to protect those entering a government building from violent assault can exist, if at all, only where there is actual or constructive knowledge of an imminent probability of that particular type of harm."

473 F.Supp. at 320. *Turner* is also inapposite to the instant case.

In *Turner*, plaintiff was working in a government building at 6:00 p. m. when she was attacked and injured. Plaintiff claimed that the Government was negligent in reducing the number of security guards and lowering the lighting in the building, even if done, with respect to the latter, for reasons of energy conservation. The Court held that the degree of security and extent of lighting the Government provided were discretionary matters within the discretional function exemption to the Federal Tort Claims Act.

The factual differences are numerous. There, security was provided by the Government for the building; the public at large was not invited into the building at the time of the incident; business hours had ended for the day; and incidents of prior criminal acts generally were non-violent and occurred during office hours.

Furthermore, the regulation cited in *Turner* which set forth criteria to be used by a government agency in determining the appropriate degree of protection it should afford supports the conclusion that foreseeability should not be as narrowly construed as defendant contends. The regulation provides that:

Determination of the level of normal protective service will be made by GSA on a case-by-case basis and will consider the facility's location; size and configuration; history of criminal or disruptive incidents in the surrounding neighborhood not primarily directed toward the occupant agency's mission; extent of exterior lighting, presence of physical barriers; and such other factors as may be deemed pertinent.

41 C.F.R. § 101.20.502.

The pertinent factors laid out in this regulation are analogous to the factors contributing to a determination of foreseeability.

**13.** The Court cited *Totten v. More Oakland Residential House, Inc.*, 63 Cal.App.3d 538, 134 Cal.Rptr. 29 (1976), in support of this proposition.

particular part of a college campus, the whole of which was protected by security and did not otherwise have a single instance of serious violent crime since the inception of the school, is significantly less foreseeable than the occurrence of violent criminal acts in a rectangular room located in an area to which similar prior criminal acts have occurred, which has no security whatsoever, has only one means of access, is shielded from street passerbys, and is open to the public 24 hours a day.

*Relevant Crime Statistics*

The North Miami Beach Police Department crime statistics reveal that in the two years prior to the rape of the plaintiff, eight property-related crimes were reported in and about the post office. These crimes included burglaries of lockboxes and other acts of vandalism.

For the purpose of compiling crime statistics, the North Miami Beach Police Department divided the approximately 4½ square mile area of North Miami Beach into four sections, called grids. The Department denoted serious crimes such as murder, rape, and robbery as Part I crimes. In the years 1977 and 1978, 865 Part I crimes were reported for the section in which the post office is located, grid # 340.[14] Of these crimes, 19 were rapes.[15]

These statistics indicate that the post office, and the area in which the post office was located, were subject to definite risks of criminal activity. When considered in conjunction with the physical layout of the post office lobby—i.e., having one exit, not being visible from the street—and the other pertinent factors as laid out above, the Court finds that the defendant created a dangerous situation in the lobby area from which it was foreseeable that a violent act

was likely to occur. *Gibson v. Avis Rent-a-Car System, Inc.*, 386 So.2d 520 (Fla.1980).[16]

The creation of a dangerous situation within the post office lobby, therefore, in effect caused the rape of the plaintiff. Hence, defendant's conduct proximately caused the harms alleged by the plaintiff. *See Fellows v. Citizens Federal*, 383 So.2d 1140 (Fla. 4th DCA 1980).

Prior to a finding of negligence, however, the Court must first consider whether defendant's conduct constituted a breach of its duty of ordinary reasonable care. This requires balancing the severity of the foreseeable harms against the cost of avoiding the harm. *See generally United States v. Carroll Towing Co.*, 159 F.2d 169 (2d Cir. 1947). The costs of the foreseeable harms that might result from violent criminal acts were considerable. The costs of avoiding such harms, on the other hand, were minimal. The March 1979 survey found that the lockboxes were hardly used during non-service hours.[17] If the Government still wanted the lobby area to remain open, it could have provided security for the lockbox lobby after service hours. Otherwise, defendant easily could have avoided the foreseeable harms by simply locking the doors of the post office when the service area was closed for the day. In light of the simple and efficient method of avoiding the horrible injury which occurred, it is clear that the Government did not meet its duty to the plaintiff of using the ordinary reasonable care it owed to her.

For all of the above reasons, the Court concludes that the Government had a duty of care to the plaintiff, that it breached the duty of care owed to the plaintiff, and that the plaintiff's injuries were proximately caused by the government's negligence.

---

14. The overall statistics break down as follows: 8 homicides, 19 rapes, 176 robberies, 195 aggravated assaults, and 367 simple assaults were reported in the years 1977 and 1978.

15. 10 rapes were reported in 1977, 9 in 1978, and 11 in 1979.

16. Under the circumstances, the post office lobby was a booby-trap set for innocent postal patrons to unwittingly stumble onto a crime in progress or, as in plaintiff's case, to fall prey to a criminal on the prowl.

17. Testimony of Norman Delong at trial.

252

Hence, the Court finds that the Government is liable to the plaintiff.

DAMAGES

■ The plaintiff has suffered significant and permanent injuries as a result of the rape. The evidence indicates that, prior to the rape, Jane Doe was an outgoing, "high visibility" person. She was engaged to be married, and apparently had a very affectionate relationship with her fiance.[18] The rape had a profound and lasting impact on her. Jane Doe's ex-fiance testified that the rape caused her to be more introverted, sexually inhibited, and fearful in the conduct of her everyday life. He also asserted that the effects of the rape ruined their relationship. A psychiatrist who examined her, Dr. Nixon, stated at trial that Jane Doe suffered permanent injury to her character and personality as a consequence of the rape, and that clinical treatment was imperative.[19] The Court has considered the various harms to plaintiff in reaching a sumcertain figure of damages. In compensation for pain and suffering, past and future medical expenses, and other damages resulting from the rape, the Court hereby:

ORDERS and ADJUDGES that defendant shall pay plaintiff the sum of seventy (70) thousand dollars. Prejudgment interest shall not be added to such damages.

---

18. Trial testimony of Ann Shapiro, close friend of plaintiff.

19. Dr. Nixon testified at trial that after plaintiff's first visit, he concluded that plaintiff should receive bi-weekly treatment for two to three years. After plaintiff's visit in 1981, he felt that treatment was still important. Dr. Nixon further testified that psychiatrists charge between $60 and $85 an hour for treatment.