Richard O'BARRY and Russell
Rector, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 92–10057–CIV.

United States District Court,
S.D. Florida.

Dec. 19, 1995.

Stanley Rosenblatt, Miami, FL, James T. Hendrick, Key West, FL, for Plaintiffs.

David Hutchinson, Torts Branch—Civil Division, Washington, DC, for Defendant.

### MEMORANDUM OPINION

JAMES LAWRENCE KING, District Judge.

Richard O'Barry and Russell Rector brought this action, alleging that they sustained personal injuries while attempting to prevent the United States Navy from exploding a twelve hundred pound bomb ninety miles north-northwest of Key West, Florida. The test was conducted August 10, 1990 by

the Navy's Underwater Explosive Research Division, utilizing Navy civil service employees of Moby Marine Corporation and General Offshore Corporation.

The Navy's purpose in conducting the test authorized by Congress under the Live Fire Test Program, 10 U.S.C. § 2366 (1988) was to evaluate the effect of intense explosive shock on new weapons systems the Navy was contemplating purchasing for installations in U.S. submarines.

Plaintiffs seek both compensatory and punitive damages, alleging federal jurisdiction under the Suits and Admiralty Act, 46 U.S.C.A.App. §§ 741 et. seq., the Public Vessels Act, 46 U.S.C.A.App. §§ 781 et. seq., 28 U.S.C.A. § 1333 and The General Maritime Law.[1]

The Government alleges that federal courts do not have subject matter jurisdiction over Plaintiffs' claims because this action comes within the ambit of the discretionary function exception to the United States' waiver of sovereign immunity in the Suits and Admiralty Act and the Public Vessels Act. Further, it denies Plaintiffs' allegations of assault and battery, infliction of emotional distress and false imprisonment, resulting in personal injury.

## I. FINDINGS OF FACT

### A. Intent of the Plaintiffs.

The Plaintiffs flew to the bomb test site with the intention of preventing the explosion irrespective of harm or cost to themselves. They were motivated by a sincere belief that the Navy's test had serious potential for the maiming or killing of dolphin. The lifetime dedication of each of these men to the protection of these beautiful creatures overrode any consideration that normally would have governed their actions and caused the ensuing confrontation.

The extremes to which the Plaintiffs were willing to go to stop the test bomb exploding at any cost is established by the action of Richard O'Barry on August 9, 1990.

On that morning, during preparations for detonation of the test charge, a private vessel entered the clearly marked safety zone delineating the bomb site with a television crew and Mr. O'Barry. The vessel Pozzaz, carrying Plaintiff O'Barry and a television crew, announced over the radio that a man was overboard, implying a distress situation. In fact, Mr. O'Barry entered the water outfitted in wet suit, snorkel and fins, to swim to the buoy over the explosive charge located at the center of the safe zone.

For the next nine hours, Mr. O'Barry held onto the buoy at ground zero, treading water, and refusing all requests to leave the area. By his actions, and indeed by his statements to the Navy contract personnel conducting the test, who were pleading with him to leave the area, he made his intent abundantly clear. From the time he dove off the television boat Pozzaz, until he finally exited the water nine hours later, he intended to provoke a confrontation and prevent the explosion. Although hoping not to be injured, he knew that if an accident occurred detonating the bomb as he treaded water thirty feet over ground zero, he would have been blown sky high to his death.

In risking his life for his cause, Mr. O'Barry established (1) the depth of his strong conviction, and (2) his total disregard of his own safety to uphold those convictions.

Having been successful in preventing the explosion and provoking a confrontation, Mr. O'Barry ultimately climbed aboard the Navy contract vessel, where he was treated courteously and provided food and water. That evening he was transferred to the U.S. Coast Guard vessel Padre, which immediately set sail for Key West. Vowing to return, Mr. O'Barry was delivered ashore the following morning by the Coast Guard.

Fully aware of the incidents outlined above, including (1) his willingness to risk his

---

**1.** This action had been previously filed in Florida state court by O'Barry and Rector in October, 1990 against Moby Marine Corp. and General Offshore Corp.; the action was removed to the U.S. District Court and ultimately dismissed for failure to join an indispensable party, the United States of America under the Suits in Admiralty Act 46 U.S.C.App. § 742 and the Public Vessels Act 46 U.S.C.App. § 781. The action was then refiled on August 7, 1992 naming the United States as a party, in addition to Moby Marine and General Offshore Corp.

own life, (2) his total commitment to disrupt the congressionally authorized and lawful testing procedures of the United States, (3) his commitment to confrontation, and (4) his vow to return the following day to pursue the objectives he had so successfully accomplished on August 9, the Navy ordered the bomb exploded at 10:53 a.m. on the morning of August 10, 1990.

In order to ensure that the test could be conducted safely and successfully, the Navy arranged for the Coast Guard cutter Padre to return from its one hundred and eighty mile round trip of delivery of Mr. O'Barry to Key West, to the test site. This was to ensure a law enforcement presence when the bomb was exploded.[2] The Padre did, in fact, return, arriving at approximately 10:10 a.m. and commenced policing the four thousand yard danger area surrounding the bomb site.

Before the tests began, a safety zone[3] around the site was established and publicly announced to prevent unauthorized people from entering the area. Extensive notice was provided to the citizenry through police hearings and a published Notice to Mariners, advising the commercial fishing interests and boating public to avoid the sea area.

The test was conducted in international waters about ninety miles west-northwest of Key West, in the Gulf of Mexico, by a mix of Navy civil service employees. The site was not within a marine sanctuary.

The technical aspects of the testing were conducted by the Navy's Underwater Explosive Research Division (UERD). Support for the testing was supplied through various vessels and contractors. The "Officer in Charge" (OIC) at the scene of the testing project, Robert Krezel, was from UERD.

He was responsible for the safety and security of everything that was out on the test site. The on-site headquarters was on board the Navy's UEB–1 (Underwater Explosive Barge). The range clearance, which meant ensuring the environmental procedures were carried out and of giving the "clear" or "not clear" to the OIC, was the responsibility of Robert Jacob, who was quartered on the Moby Ruth, a vessel owned by the contract corporation. The OIC could not execute the test without an "all clear" signal. This effort was supported by an airplane searching the area from the sky for dolphin, turtles, whales, and other large marine mammals. A number of smaller surface craft were also involved as support vessels. The explosives and the testing model were located on the AB–1 (Navy auxiliary barge), sometimes referred to as the "model" or the "beer can". Communications between all personnel on site were coordinated through portable radio. In addition, there was radio communication available to the NADC Director at Key West, Dan Probert.

Meanwhile, after having been escorted by the United States Coast Guard to Key West in the early morning hours of August 10, Mr. O'Barry met with Russell Rector. The two Plaintiffs then made arrangements with the operators of a seaplane service to fly them from Key West, Florida back to the test site, on the morning of August 10, 1990. The two Plaintiffs boarded a seaplane and flew back to the test site, arriving at approximately 11:15 a.m. As soon as the seaplane touched down at a safe distance outside the area marked by the Navy buoys to delineate the area of the test explosion, the Plaintiffs disembarked.

---

**2.** The Secretary may take actions to prevent or respond to an act of terrorism against an individual, subject to the jurisdiction of the United States, and located within or adjacent to the marine environment. Under this Act, the Secretary may carry out or require measures including the establishment of security and safety zones and the development of contingency plans and procedures, to prevent or respond to acts of terrorism. 33 U.S.C.A. § 1226(a)(b).

**3.** The Secretary may take such action as is necessary to protect the navigable waters and the resources therein from harm resulting from vessel or structure damage, destruction or loss.

This action may include, but need not be limited to, establishing waterfront safety zones or other measures for limited, controlled or conditional access and activity when necessary for the protection of any vessel, structure, waters or shore area. 33 U.S.C.A. § 1225(2)(c). The Secretary has the authority to control vessel traffic in areas subject to the jurisdiction of the United States, which the Secretary determines to be hazardous, by restricting operation in any hazardous area or under hazardous conditions—which he considers necessary for safe operation under the circumstances. 33 U.S.C.A. § 1223(a)(4)(D).

On the previous day, Mr. O'Barry had swum from the television vessel Pozzaz, to the buoy directly over the explosive charge under his own power, unaided except by the use of snorkel and fins. This time, the Plaintiffs had brought along with them a gasoline powered water aqua scooter, capable of propelling them more rapidly through the water. Utilization of the aqua scooter provided the Plaintiffs with a certain degree of maneuverability by which they planned to evade any attempt to intercept their progress to the center of the test site and the buoy directly over the explosive charge.

Rector, operating the aqua scooter with O'Barry holding onto his ankles, set a direct course for the bomb site buoy immediately upon entering the water from the seaplane. The seaplane departed the area (presumably to return to Key West), leaving the Plaintiffs in the middle of the Gulf of Mexico.

At this point in time, the underwater explosive bomb had already been detonated and the naval experts and civilian technicians had opened the object being tested for inspection and analysis. A number of post-test activities, incident to the analysis of the test results, were underway. Inside the simulated submarine, sometimes referred to by the parties as the "beer can", alarms were going off due to flooding of the vehicle model. Any fish killed by the explosion were being carefully collected by one of the boats to be preserved in ice chests and returned for exact auditing at the naval base in Key West. Technicians were working with the monitoring devices connecting the umbilical cord to the model vehicle. The umbilical cord, it should be explained, was a waterproof encased bundle of electrical wires connecting instrumentation on the test model vehicle with the Navy surface ships.

A decision was made by the officer in charge to attempt to block the Plaintiffs from reaching the test model or the umbilical cord until the Coast Guard vessel Padre could be ordered to return to the scene to deal with Mr. O'Barry and Mr. Rector. The Coast Guard vessel had been at the bomb test site, policing the area, until after the test bomb had been successfully exploded. The Coast Guard had then left the area.

The officer in charge directed the boats at the site, including the Moby Ruth, NADC 66, and various small Boston Whalers, to place themselves between the Plaintiff swimmers, the model test object, and the umbilical cord connecting the test model to the UEB–1.

The captain of the Moby Ruth attempted to maneuver his very large vessel to a position in front of the Plaintiffs as they proceeded toward the test object, using the gas power swimmer propulsion aqua scooter. The Moby Ruth is a huge, and not very mobile vessel. The momentum of the vessel caused her to cross the direct path of Plaintiffs, and they proceeded aft of her through her wake. The captain of the Moby Ruth brought her around in a three hundred sixty degree turn and this time was able to move the vessel forward (and aft) to block Plaintiffs' path.

Realizing that the Moby Ruth was blocking them, Mr. Rector undertook an evasive maneuver parallel to the port side of the Moby Ruth until he could attempt to cross the broad bow of this large vessel.

The Plaintiffs were determined to outmaneuver the Moby Ruth and other smaller vessels attempting to block their progress. The Defendants were equally determined to prevent the Plaintiffs from carrying out their objective to get near the test model vehicle and the umbilical cord.

It was at this point, while attempting to maneuver around the broad bow of this very large vessel, that Plaintiffs came into contact with the Moby Ruth. The impact broke the hold Richard O'Barry had on the ankles of Russell Rector and they became separated. Mr. Rector, propelled by the aqua scooter, rounded the bow of the Moby Ruth and continued in a straight line for his target objective, leaving Mr. O'Barry in the sea by the side of the Moby Ruth.

Mr. O'Barry remained in the sea from ten to fifty feet of the portside of the Moby Ruth, as it continued to block all his attempts to swim around the vessel and on to the target. During this time, he was urged to come out of the water and aboard the larger vessel. Whenever requested, he declined the invitation, stating that he did not believe the state-

ments of the Navy personnel that the test was over and that he should come out of the water and go home. He simply swam away whenever either the Moby Ruth or any of the smaller vessels got near enough to reach to him to pull him out of the water.

On occasion, Mr. O'Barry was swimming with a back stroke that did not permit him to see objects behind him. The Boston Whaler and other small boats were moving in circling turns around him, attempting to prevent his determined effort to swim to the target vessel. During all of this, Mr. O'Barry came into contact with the Whaler's aft port quarter, when his head struck the Boston Whaler. The crew of the Whaler offered assistance, but he said he did not want any help, and continued to remain in the water, declining their request to come into the boat.

The testimony reflects that one member of the NADC 66 boat attempted to place a large oval fish net over Mr. O'Barry, while he was avoiding being brought aboard the boat.

While this was all occurring, Mr. Rector, utilizing the gas propelled aqua scooter, was having more success with maneuvering around the boats that were attempting to block his progress. He also was told that the test explosion had already taken place, to which he replied that he did not believe what they were telling him.

The Navy personnel in the small boats came close enough to Mr. Rector's aqua scooter to remove the snorkel from the scooter, thus causing it to be immobilized with the intake of sea water. One of the sailors retrieved the aqua scooter and later returned it to Mr. Rector. Mr. Rector, at the time of the retrieval from the ocean, thanked the sailor for taking it into the boat and saving it for him.

On another occasion, one of the civilian employees, William Wood, reached out to Mr. Rector and pulled his face mask and snorkel from his face. One of the persons on the NADC 66 small boat attempted to throw a large fish net over Mr. Rector. The Plaintiff drew a knife from a leg sheath and cut the net to pieces. This caused the officer in charge of the test to have a concern that the Plaintiff could have the intention of slashing the mile long umbilical cord containing the electrical wiring that connected the target model with the monitoring Navy ship. Had this been done, it could have resulted in serious injury or death to the person slashing into the umbilical cord.

The United States Coast Guard vessel Padre arrived on the scene and launched a small rigid hull inflatable boat to attempt to retrieve the Plaintiffs from the water.

Mr. Rector refused, at first, to get into their boat and was only persuaded to do so when told that Mr. O'Barry had been injured and needed Coast Guard assistance.

The Plaintiffs were taken aboard the small Coast Guard boat and transported to the Padre, where Mr. O'Barry was given a neck brace and assisted up the Jacob's ladder on to the larger vessel. Mr. Rector was able to climb up the Jacob's ladder and proceed unaided to sick bay, where both Plaintiffs were examined by the Coast Guard medical corpsmen.

Medical corpsman Jeffrey Kerner testified that he observed no cuts or abrasions on either Plaintiff, and that they were displaying no problems with function of arms and legs. They were sensitive to pain and they were alert.

Each of the Plaintiffs, in their sworn testimony during the trial, expressed the opinion that the personnel operating the Navy and civilian boats during this confrontation were deliberately and intentionally attempting to run them down and kill them.

The Court finds this testimony to be completely unbelievable. There is no competent evidence that the Defendant, its agents or employees, intended to harm or injure Plaintiffs in any way. To the contrary, this record is clear that the Plaintiffs, probably motivated out of a very sincere desire to prevent the explosion and thereby protect their beloved dolphins, had little or no concern for their own personal safety. By the dangerous maneuvers they undertook to deliberately inject themselves into what (as far as they knew at the outset of exiting the seaplane) was a highly dangerous underwater explosive test site, one could conclude that they were al-

most inviting personal injury in order to call attention to their cause.

## CONCLUSIONS OF LAW

This Court has jurisdiction, pursuant to 28 U.S.C. § 1333, over this admiralty action. Jurisdiction over the Defendant United States of America is pursuant to the Public Vessels Act, 46 U.S.C.App. §§ 781–789, incorporating provisions of the Suits in Admiralty Act, 46 U.S.C.App. §§ 741–752.

## I. INTENTIONAL TORTS

■ Plaintiffs have failed to prove their assertion that employees of the Defendant injured them while attempting to inflict serious bodily injury. The Plaintiffs testified that "They were trying to kill us!" This testimony is not believable when all of the evidence of the events that transpired during the confrontation are considered. The record is clear that any injuries sustained by the Plaintiffs occurred by reason of their own negligent and highly dangerous activity, evidencing a disregard for their own safety.

The Navy personnel acted reasonably in maneuvering their boats at the scene to prevent Plaintiffs from swimming into a bomb test site exclusion zone and violating military security.

O'Barry and Rector entered a declared warning area[4], and intentionally interfered with hazardous activities being conducted by the United States Navy at sea. Their stated purpose was to prevent and disrupt a congressionally authorized navy underwater high explosive shock test. Their conduct on August 9 and 10, 1990, obstructed the Defendant's right to conduct lawful military operations and jeopardized the safety and security of personnel and property in the restricted test site area.

Plaintiffs submit that, since the explosion had occurred prior to their arrival in the seaplane on August 10, that their activities did not jeopardize either the test or navy personnel and property. This overlooks the fact that the Defendant was engaged in significant work immediately after the explosion. Navy employees and civilian contractors in the flotilla of boats on the scene were assimilating all relevant data incident to the effect the explosion had upon the military weapons and submarine being tested. While this was occurring, warning alarms were emanating from the test vehicle, indicating that it was commencing to fill up with water. Preventing this from occurring in timely fashion so as to permit the continuation of the test gathering activity was an intrusion into lawful navy activities by the Plaintiffs.

Other activities the Defendant was attempting to do after the explosion were the inventory and evaluation of harm to fish injured or killed in the explosion. One boat was delegated to retrieve from the ocean any dead fish floating atop the sea and to preserve it in an ice chest for subsequent study at the U.S. Navy facilities in Key West. The importance of the test by gathering and evaluating the effects of the explosion on the weapons being tested had not been concluded at the time the Plaintiffs arrived in the seaplane and were, indeed, ongoing.

By entering the ocean and utilizing the aqua scooter to propel them into the exclusion zone, the Plaintiffs deliberately placed themselves in harm's way by consistently attempting to go around, and on at least one instance under, the navy craft that were attempting to place themselves in a position to block their interference with lawful governmental operations. They caused the confrontation and are responsible for any injuries they may have sustained.

By continuing to swim toward the test object, despite repeated warnings and instructions not to proceed, the Plaintiffs clearly evidenced their intent to challenge the Defendant to stop them if it could.

Instead of simply turning around and exiting the exclusion zone, as they were repeatedly asked to do, Mr. Rector attempted

---

**4.** Customary international law provides that any nation may declare a warning area on the high seas to advise of the conduct of activities that, although lawful, are hazardous to navigation. Notice of the establishment of such a warning area, as here, is promulgated, in advance, usually in the form of a Notice to Mariners. Ships are not required to remain clear of a declared warning area, but they are obligated to refrain from interfering with activities therein.

to "put a move on" the massive and slow moving Moby Ruth by unsuccessfully cutting across its broad bow. Fortunately, as the testimony of the navy corpsmen and the hospital records from navy and civilian Key West hospitals indicate, the Plaintiffs were not seriously injured.

Naval operations, although hazardous, are appropriate activity for governments. These activities are, of course, conducted with due regard for the rights of other nations and the safe conduct and operation of other ships.[5]

The officer in charge of the overall test site and the many vessels operating under his command, acted responsibly in taking actions that, in his judgment, were calculated to protect the test vehicle UEB-1, its associated equipment, and all personnel at the site. The Court finds that his decision and actions that day were reasonable and appropriate under the circumstances.

## II. SOVEREIGN IMMUNITY

 Barring waiver by statute, the doctrine of sovereign immunity protects the government from suit.[6] Congress waived immunity for, *inter alia*, certain torts that occur on the high seas. *See* 46 U.S.C.App. §§ 742, 781. There exists an exception to the government's waiver of sovereign immunity whereby the government cannot be held liable for its "discretionary acts." The discretionary function exception precludes judicial review of any government decision in which there was "room for policy judgment and decision." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 811, 104 S.Ct. 2755, 2763, 81 L.Ed.2d 660 (1984). The discretionary function exception also shields the government from liability for the allegedly negligent acts of those individuals who were "carrying out the operations of government in accordance with official directions." *Dalehite v. United States*, 346 U.S. 15, 35–36, 73 S.Ct. 956, 967–68, 97 L.Ed. 1427 (1953). The government argues that this exception ap-

plies here, so that even if the government's agents acted negligently in protecting the test site, Plaintiffs' suit would be precluded.

This Court finds that the instant action does not fall within the discretionary function exception to the government's waiver of sovereign immunity. While it is true that negligent acts of individuals carrying out government operations are not actionable, the allegations involved here are intentional torts: assault and battery, false imprisonment, and the intentional infliction of emotional distress. These torts do not involve the negligent execution of government objectives "in accordance with official directions." *Dalehite*, 346 U.S. at 36, 73 S.Ct. at 968. As such, the doctrine of sovereign immunity does not preclude Plaintiffs' suit.

## III. CONCLUSION

Accordingly, after a careful review of the record, and the Court being otherwise fully advised, it is hereby ORDERED and AD-JUDGED that judgment is entered in favor of Defendant and against Plaintiffs. Final judgment will be entered by separate order.

DONE and ORDERED.

---

**5.** Article 12, 1958, Convention on the High Seas, Apr. 29, 1958, 13 U.S.T. 2312, T.I.A.S. No. 5200; Article 87, U.N. Convention on the Law of the Sea, U.N.Doc.A.CONF. 62/122 (1982); *reprinted in* UNITED NATIONS, THE LAW OF THE SEA 1 (1983).

**6.** Sovereign immunity is based on the principle that the separation of powers requires that the judiciary refrain from interfering with executive branch and legislative branch powers.